```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


JUNE CHO,                          )
                    Plaintiff,     )
                                   )
v.                                 ) CASE NO.:
                                   ) 1:18-CV-00288-WO-JLW
DUKE UNIVERSITY, a North Carolina  )
Corporation; and MARILYN HOCKENBERRY,)
                                   )
                    Defendants.    )
```

The deposition upon oral examination of JUNE CHO, taken pursuant to Notice and in accordance with the Federal Rules of Civil Procedure before Rebecca J. Huddy, Notary Public, at the offices of The Quinn Law Firm, 315 Spring Garden Street, Suite 1D, Greensboro, North Carolina, on the 11th day of January, 2019, beginning at 9:00 a.m.

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 1 of 31

```
 1   Q.   Let's stop there so that we can --
 2   A.   Okay.
 3   Q.   -- make sure the court reporter understands.  It's an
 4        R01, that's a National Institutes of Health grant?
 5   A.   Right.
 6   Q.   Okay.  For research?
 7   A.   Yes.
 8   Q.   Okay.  So you had -- I'll let you go on, but you
 9        received the R01 --
10   A.   Uh-huh.
11   Q.   -- grant?
12   A.   2014, and I work one year with that funding at UAB, and
13        then I apply position at Duke University, and actually
14        this time faculty opening was available, but before
15        that Duke Dean ask me to come to Duke.
16   Q.   They did have a position open or they did not at Duke?
17   A.   Not exactly my position.
18   Q.   It wasn't exactly your position?
19   A.   No, because there was a junior researcher position kind
20        of thing, but it was not on that faculty opening
21        section.
22   Q.   Okay.
23   A.   But when we had national conference --
24   Q.   A national conference --
25   A.   -- 2014, fall 2014, I was invited to attend Duke
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 2 of 31

```
 1   Q.   And do you know who actually made the decision to hire

 2        you?

 3   A.   I believe final decision made by Dean.

 4   Q.   Okay.

 5   A.   And I'm not sure it is helpful for you, but before I

 6        apply, I had a phone conversation with Dean Broome.  It

 7        was at Thanksgiving period, but she was very willing to

 8        talk to me and she said, We don't have exactly the

 9        position, but we love to look at your potential, yes.

10                 (Exhibit No. 2 was marked for identification

11        by the reporter.)

12   Q.   Okay.  So the court reporter has handed you what's been

13        marked Exhibit 2.

14   A.   Uh-huh.

15   Q.   If you'd turn to the second page, is that your

16        signature?

17   A.   Yes, uh-huh.

18   Q.   And is this your offer letter?

19   A.   Right.

20   Q.   And that's signed by Dean Broome?

21   A.   Right.

22   Q.   Okay.  Did you have any complaints about the manner in

23        which you were hired at Duke?

24   A.   The position was not really important to me that time,

25        because I really want to live together with my husband,
```

Case 1:18-cv-00288-WO-JLW  Document 20-1  Filed 04/11/19  Page 3 of 31

```
 1   Q.   Okay.

 2   A.   That usually takes six months.

 3   Q.   Okay.

 4   A.   But UAB people work very hard and they were able to

 5        transfer after three months.

 6   Q.   Okay.

 7   A.   So I brought all money from UAB to Duke.

 8   Q.   Do you have an understanding of who has responsibility

 9        for the grant once it's transferred to another

10        university?

11   A.   Uh-huh.

12   Q.   And does Duke have responsibility once the grant is

13        transferred --

14   A.   Uh-huh.

15   Q.   -- over to Duke?

16   A.   Uh-huh, uh-huh.

17   Q.   That's yes?

18   A.   Yes.

19   Q.   When you started at Duke, were you -- did you have an

20        orientation process?

21   A.   Yes.

22   Q.   And were you given a copy of the faculty handbook?

23   A.   Briefly, yes.

24   Q.   Did you -- was the faculty handbook available to you

25        online?
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 4 of 31

```
 1         help Marilyn Hockenberry very much, and Marilyn

 2         Hockenberry always listen what Phyllis said, and

 3         Phyllis is kind of the boss of labor union.

 4    Q.   Were you in a union?

 5    A.   There is something, and you can find out, because there

 6         was not my intention.  But with all my research staff,

 7         they told me that Phyllis is their supervisor.

 8    Q.   Okay.  Do you --

 9    A.   I am not.  So they have to ask Phyllis.  Whenever they

10         need any time off and anything, activity involved in

11         research, research staff has to get permission from

12         Phyllis first and then let me know what Phyllis said.

13    Q.   Okay.  Do you know Phyllis's job title?

14    A.   I -- I put somewhere.

15    Q.   Okay.

16    A.   Manager for Study Oversight.

17    Q.   Okay.  So your staff reported to Phyllis?  She was

18         their direct supervisor?

19    A.   Well, I cannot ask anything directly to my research

20         staff.  I have to ask my research staff, and research

21         staff ask Phyllis, and if Phyllis said yes, you can do,

22         then research staff do something.

23    Q.   And do you know whether that is the structure at Duke

24         for research projects?

25    A.   No, no.  But --
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 5 of 31

1 Q. Is that a no, you don't know?

2 A. I don't know, because I didn't know, because I never

3     expose those kind of system.

4 Q. So the reporting structure was new to you?

5 A. Right, because I have experience only at UAB, and UAB

6     doesn't have those kind of system.

7 Q. Okay.

8 A. Only the PI, Principal Investigator, has project

9     meeting with research staff, and we get together and

10    exchange our opinion together, but there is nobody that

11    enter our in conversation whatever. But Phyllis is

12    kind of -- I don't know -- can I say mediator,

13    moderator.

14 Q. Okay. So you -- it was your term to say labor boss,

15    that you viewed her as kind of a labor boss?

16 A. Yes, yes.

17 Q. Okay. And that was a new system to you when you

18    started at --

19 A. Totally new.

20 Q. -- Duke? Okay. Kimberley Fisher, who is Dr. Fisher?

21 A. Kim Fisher is Director of Neonatal Perinatal Research

22    Unit. She got Ph.D. from School of Nursing at Duke.

23 Q. Okay.

24 A. And she has been working as Director for many years, I

25    believe.

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 6 of 31

```
 1    A.    But home visit won't be, yeah, doable, so kind of

 2          concern.

 3    Q.    So the home visits, those were not included in your

 4          Duke protocol?

 5    A.    Right.

 6    Q.    Okay.  Let me shift gears briefly.

 7                Dr. Hockenberry, was her office near your

 8          office?

 9    A.    No.  Her office was on the fourth floor.  Mine was

10          second floor.

11    Q.    Okay.  How often did you see Dr. Hockenberry?

12    A.    Even she saw me on the hallway, she just turn around

13          and she go a different way.

14    Q.    Okay.  My question is, how often did you have meetings

15          or interactions with her?

16    A.    Very rare.

17    Q.    Okay.  How often did you -- did you have phone calls

18          with her?

19    A.    No.

20    Q.    Did you often e-mail with her?

21    A.    As soon as she try to something, she e-mail very

22          frequently, and each time my heart is just -- yeah.

23    Q.    Dr. Cho, I'm going to ask that you just answer --

24    A.    Okay.

25    Q.    -- the questions that I'm asking you and I think we'll
```

Case 1:18-cv-00288-WO-JLW  Document 20-1  Filed 04/11/19  Page 7 of 31

| 1 | Q. | And Dr. Hockenberry? |
|---|----|----|
| 2 | A. | Uh-huh. |
| 3 | Q. | And Dr. Fisher? |
| 4 | A. | Yes. |
| 5 | Q. | And Phyllis? |
| 6 | A. | Yes. |
| 7 | Q. | Is Phyllis a doctor? |
| 8 | A. | No. |
| 9 | Q. | Okay.  And Phyllis, so there was a meeting with all of |
| 10 | | you in attendance where Dr. Hockenberry addressed |
| 11 | | reopening at UAB, correct? |
| 12 | A. | Right. |
| 13 | Q. | And it's your testimony that you had told Barbara |
| 14 | | Turner that you needed to reopen that previously? |
| 15 | A. | Not only told; I got permission from Barbara Turner, |
| 16 | | because Barbara Turner was previous ADR before Diane |
| 17 | | Holditch-Davis became ADR. |
| 18 | Q. | Okay. |
| 19 | A. | So Barbara Turner was not only ADR and my Department |
| 20 | | Chair and research area children, so I discuss with |
| 21 | | her, and she advise me, You don't need to wait five |
| 22 | | months, that's too long, why don't you just reopen at |
| 23 | | UAB.  So I got permission, and then I did -- |
| 24 | Q. | You got permission from UAB -- |
| 25 | A. | As soon as UAB is more than willing to help me, because |

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 8 of 31

```
 1        hire data technician at 100 percent --
 2   Q.   A data technician at 100 percent?  So you said you
 3        didn't have the budget to increase Becky's time --
 4   A.   But I just upset·Marilyn Hockenberry's position,
 5        because the Robin Dail left from that 50 percent -- on
 6        the 50 percent for Becky Jones --
 7   Q.   Uh-huh.
 8   A.   -- so I knew that without another 50 percent, Becky
 9        Jones cannot get enough --
10   Q.   So Becky was splitting her time between you and Dr.
11        Dail?
12   A.   Right.
13   Q.   And so Robin was leaving, and so you agreed to increase
14        her time to 70 or 75?
15   A.   70 percent.
16   Q.   70 percent?  And she was working the hours to support
17        the 70 percent for your project, correct?
18   A.   I didn't ask her work 70 percent, but she try to work
19        maybe more for the 70 percent.
20   Q.   Because she was trying to do a good job?
21   A.   Right, yeah.
22   Q.   And Dr. Hockenberry wanted her to be paid for that
23        time, correct?
24   A.   Not exactly time, but School of Nursing hire Becky
25        Jones when I started at School of Nursing and --
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 9 of 31

```
 1   A.   Preliminary, pilot study.

 2   Q.   Okay.

 3   A.   So Dr. Xu and I work together all the time --

 4   Q.   Okay.

 5   A.   -- so -- and he knows as much about my old concept and

 6        old values kind of thing --

 7   Q.   So he knew your old informational data sets and how you

 8        were proceeding in your research?

 9   A.   Absolutely.

10   Q.   And so you wanted to work with him?

11   A.   Yes.

12   Q.   And did you request that the Duke statisticians no

13        longer be on your project?

14   A.   Beginning of my project it was okay.  I can have Dr. Xu

15        as a consultant.

16   Q.   Okay.

17   A.   But later Marilyn Hockenberry ask me I cannot use Dr.

18        Xu anymore.

19   Q.   Okay.  Let me -- let me back this up.  So my question

20        was, at some point in about June or July of 2016, did

21        you ask that the Duke statisticians be removed from

22        your project?

23   A.   Not removed.  But Dr. Xu is consultant, not

24        statistician.

25   Q.   Okay.  The Duke statisticians, is it -- would you agree
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 10 of 31

```
 1        with me that you asked to have them taken off --

 2   A.   Uh-huh.

 3   Q.   -- of your project?

 4   A.   Right.

 5   Q.   And you wanted to consult with Dr. Xu?

 6   A.   Right.

 7   Q.   And Dr. Xu was at University of Texas-El Paso?

 8   A.   Right, yes.

 9   Q.   And you had listed him as a consultant on your project?

10   A.   Right, correct.

11   Q.   And did Marilyn Hockenberry say that you would need to

12        have a data transfer agreement?

13   A.   Absolutely.  We cannot transfer any data without

14        permission.

15   Q.   Okay.  And did you -- were you agreeable to a data

16        transfer agreement with him?

17   A.   Absolutely, absolutely.

18   Q.   You didn't give any pushback on --

19   A.   Never, never.

20   Q.   Okay.  Was it your understanding that if he was a

21        consultant, he wouldn't need the data transfer --

22   A.   No.

23   Q.   -- agreement?  Okay.

24   A.   For example, when I --

25   Q.   Well --
```

Case 1:18-cv-00288-WO-JLW  Document 20-1   Filed 04/11/19   Page 11 of 31

```
 1   Q.   Okay.  So let me just back that up a little bit.

 2              Is it correct that in Marilyn Hockenberry's

 3        role or -- that it would be within the scope to request

 4        an audit, correct?

 5   A.   Yes.

 6   Q.   And you disagreed with her requesting the audit because

 7        you didn't understand that there was anything that had

 8        been done wrong, correct?

 9   A.   I didn't discover it, because I didn't know what I did

10        wrong, so I just upset.

11   Q.   Okay.

12   A.   And Barbara Turner start to say, I know you did

13        everything and I just want to this auditing over very

14        quickly so you can just resume your study.

15   Q.   Okay.  So you spoke with Dr. Turner and she said, Let's

16        let the audit process go through its process and then

17        you can resume your study?

18   A.   Right.

19   Q.   So during the audit there was no active enrollment

20        at --

21   A.   No.

22   Q.   -- at Duke --

23   A.   That's whole --

24   Q.   -- or at UAB?

25   A.   -- whole purpose of their committee.  Since my study
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 12 of 31

```
 1   Q.   What did you tell Barbara?

 2   A.   Barbara -- Barbara knows everything, because -- until

 3        the final report from audit, and I don't need to

 4        explain further since she knows everything.  So I think

 5        this whole IRB issue is clarified, clear.  I think I

 6        better go somewhere.

 7             And Barbara Turner says, So which office are

 8        you think about.  So I talk about that Equity,

 9        whatever, and she say, Maybe you look at Ombudsman,

10        something.  So I let know before I got know from some

11        other person, and then actually Robin Dail and --

12   Q.   Let me back you up a little bit.  I'm not

13        understanding.

14             When you went -- so you went to Barbara Turner

15        and she said you can go to the Ombudsman?

16   A.   Right.

17   Q.   And you went to Office for Institutional Equity?

18   A.   Before Ombudsman Office.

19   Q.   Before -- was that before or after you spoke with Dr.

20        Turner?

21   A.   You -- the Equity office on the campus?

22   Q.   The Office for Institutional Equity?

23   A.   That is on the campus.

24   Q.   It's near campus in -- in a --

25   A.   Warehouse, there is a --
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 13 of 31

```
 1   Q.   Yes, yes.

 2   A.   -- warehouse, yes.  I went there first.

 3   Q.   And you spoke with him?

 4   A.   Uh-huh.

 5   Q.   And he said, This isn't something that I can help you

 6        with?

 7   A.   No, yeah.

 8   Q.   You should go to the Ombudsman?

 9   A.   He didn't know where I have to go, but he said that he

10        promise me he will look at which place I have to go.

11   Q.   Okay.

12   A.   And then --

13   Q.   But he said that you -- what you were telling him

14        wasn't something that was in his purview?

15   A.   Right.

16   Q.   Okay.

17   A.   Right.

18   Q.   And do you recall what you told him specifically?

19   A.   Just kind of -- oh, this academic freedom and the

20        harassment, that kind of thing.

21   Q.   What did you specifically say about harassment?

22   A.   I explain here, she deal very tight microscope

23        management.

24   Q.   That Dr. Hockenberry was a micromanager?

25   A.   And then not only that, very tight management at using
```

| | | |
|---|---|---|
| 1 | | her institutional -- the position. |
| 2 | Q. | So a lot of oversight -- when you say tight, what do |
| 3 | | you mean by that? |
| 4 | A. | For example, for e-mail, this is one example.  When I |
| 5 | | send e-mail to somebody, that somebody has to refer |
| 6 | | that e-mail to -- forward it to Marilyn Hockenberry, |
| 7 | | and Marilyn Hockenberry -- somebody ask her own |
| 8 | | research tell everybody, Put her as a cc all the time, |
| 9 | | carbon copy all the time. |
| 10 | Q. | Okay. |
| 11 | A. | So even I didn't expect any response from Hockenberry, |
| 12 | | Hockenberry just grab my neck. |
| 13 | Q. | Why do you think she did that? |
| 14 | A. | That's my really good question, and she believe that |
| 15 | | just tight management with just a strong fist -- |
| 16 | Q. | She was a -- |
| 17 | A. | -- to somebody is best management is her position. |
| 18 | Q. | So you think she was just a -- ruled with an iron fist? |
| 19 | A. | Iron fist, exactly.  And if she had really good |
| 20 | | knowledge and she had some intention to help me, |
| 21 | | support me, that's (inaudible), is strong or -- I don't |
| 22 | | mind.  But as a human being, I felt that it's just |
| 23 | | block without the support. |
| 24 | Q. | You felt she was just blocking you without the support? |
| 25 | A. | Absolutely. |

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 15 of 31

```
 1   Q.   And that she was micromanaging your research and your

 2        project?

 3   A.   That's my, yeah, understanding, uh-huh.

 4   Q.   Did you have an understanding as to why she would do

 5        that?

 6   A.   That's a really good question I really want to get to

 7        know.  But first, I have some my understanding.  First,

 8        she's very tight management with very strong iron fist,

 9        fist of iron.

10   Q.   That's your understanding of her management style?

11   A.   Management style.

12   Q.   Okay.

13   A.   And for example, at the meeting she just one side will

14        keep all direction and no reason and then meeting's

15        over, always like that, and without any really

16        knowledge about the ADR's role, that's my first

17        understanding.

18             Second, if I did right, if they did wrong, she

19        just ignore.

20   Q.   She didn't --

21   A.   Respond.

22   Q.   If you had done something correct, she didn't

23        respond --

24   A.   Uh-huh.

25   Q.   -- in a positive manner?
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 16 of 31

```
 1   A.   If I did wrong, she poke her nose at every each corner.

 2        But if I did right and if she did wrong, never respond.

 3        And she doesn't -- didn't want to accept those kind of

 4        situation.

 5   Q.   Okay.

 6   A.   Not -- I can give you more example later.

 7             And third one, I'm not sure, but as a human

 8        being, I can feel it, she's very divided, one group of

 9        her circle, another group from that circle.

10   Q.   I'm just -- I'm not understanding the word.

11             MS. QUINN:   Circle.

12   Q.   Circle, okay.

13   A.   Uh-huh.

14   Q.   So she has her favorites?

15   A.   Own favor, yes.

16   Q.   Okay.

17   A.   And is the own favor is related to me the previous ADR,

18        Diane Holditch-Davis team.  Not team, but related to me

19        the previous ADR, Diane Holditch-Davis, and special

20        (inaudible) from UNC-Chapel Hill, those are on favorite

21        and those are on blacklist.

22   Q.   She didn't like the people from UNC-Chapel Hill and

23        Diane Holditch's team; is that what I'm understanding?

24   A.   Correct, correct.

25   Q.   Okay.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 17 of 31

| | | |
|---|---|---|
| 1 | | we'll do what we can do.  That's it. |
| 2 | Q. | And that was the extent of the call?  Anything else on |
| 3 | | that phone call? |
| 4 | A. | No, no, that's it. |
| 5 | Q. | Okay.  So then did you reach out to the Ombuds? |
| 6 | A. | Yes. |
| 7 | Q. | And what happened with that? |
| 8 | A. | Ombudsman listen this kind of thing, and then Ombudsman |
| 9 | | said, Okay, if you want to go Grievance Committee, just |
| 10 | | prepare the files so he can just tell about the file to |
| 11 | | Grievance Committee Chair. |
| 12 | Q. | So he listened to you and then said, Prepare your file |
| 13 | | or your statement or whatever to the Faculty Hearing |
| 14 | | Committee? |
| 15 | A. | Yes, and Ombudsman told me that yes, sometime |
| 16 | | administrators at high rank, they don't know what's |
| 17 | | their role. |
| 18 | Q. | So he said sometimes administrators that are higher up |
| 19 | | don't know their function? |
| 20 | A. | Right. |
| 21 | Q. | Was that in reference to -- did you discuss with him |
| 22 | | Marilyn micromanaging versus supporting your research? |
| 23 | A. | I think I did. |
| 24 | Q. | Okay. |
| 25 | A. | Yes, I explain everything, and he -- he or his |

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 18 of 31

```
 1          Hockenberry made.
 2     A.   Uh-huh.
 3     Q.   Tell me a little bit about -- what are the specific
 4          comments that you believe were defamatory?
 5     A.   What -- what -- explain a little bit.
 6     Q.   Sure.  So one of your claims is that Dr. Hockenberry
 7          made defamatory statements about you --
 8     A.   Uh-huh.
 9     Q.   -- slanderous, libelous statements about you.  What
10          comments do you attribute to Dr. Hockenberry?
11     A.   When she defamitate [sic] me, what was my response?
12     Q.   No.  What did she say?  What were the defamatory
13          comments?
14     A.   First, that she didn't want to listen what I say, so I
15          didn't have much chance to talk.
16     Q.   Okay.
17     A.   She always explain something that she think, she
18          thought, and she just make I was just person --
19     Q.   Okay.  The claim is about false statements that Dr.
20          Hockenberry made --
21     A.   Oh, false statements.
22     Q.   -- so what -- what do you contend -- what are the
23          statements that you contend Dr. Hockenberry made?
24     A.   For example, the last -- the IRB, the report, I gave
25          that safety data access to PA assistant.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 19 of 31

1    Q.    So after you were notified that your PI status --

2    A.    No, people.

3    Q.    The --

4    A.    People, I got the notice that my PI --

5    Q.    Okay --

6    A.    -- status deprive, Hockenberry did -- she something on

7          the IRB and she knew it, my PI will be deprive, and

8          then she ask her staff just to lock all doors in case

9          June Cho will come to and hurt somebody.

10   Q.    How -- okay.  Let's --

11   A.    How did I know?

12   Q.    Yes.  Let me -- who told you that?

13   A.    Dr. Im.

14   Q.    Okay.  What was the specific comment?

15   A.    She -- Dr. Im's office is just beside Marilyn

16         Hockenberry and Dr. Im try to enter her office, but

17         that door was locked, the middle door between her

18         office and hallway.  So she ask why this door was

19         locked, and staff say, Marilyn Hockenberry ask us to

20         lock all doors because June Cho will come to and maybe

21         harm somebody.

22   Q.    Okay.  So Dr. Im told you --

23   A.    Uh-huh.

24   Q.    -- that when she came to work --

25   A.    Uh-huh.

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 20 of 31

```
 1   Q.   Is that the meeting before the audit --

 2   A.   Yes.

 3   Q.   -- that you're talking about?

 4   A.   Yes, yes, yes, beginning of that, everything is

 5        fabricated after another one -- after another.

 6   Q.   Okay.

 7   A.   And I cannot count actually.

 8   Q.   Okay.  So all the statements that Dr. -- am I

 9        understanding your testimony that Dr. Hockenberry's

10        statements about your work that resulted in IRB and/or

11        the audit team looking at your work, that those

12        statements are what was false?

13   A.   Otherwise how auditing team couldn't find a thing, IRB

14        didn't find something if --

15   Q.   Are those the statements that are the subject of your

16        claim?  That's what I'm --

17   A.   Uh-huh.

18   Q.   -- trying to understand.

19   A.   Uh-huh.

20   Q.   Is that -- is that correct, that Dr. Hockenberry's

21        statements about your work that resulted in the audit

22        and/or any statements that resulted in IRB

23        investigations, are those the ones that you're

24        contending are false statements?

25   A.   Right, correct.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 21 of 31

```
 1       conversation?

 2   A.  I resign end of June and -- I think almost May, yeah.

 3   Q.  May of --

 4   A.  2018, yes, uh-huh.  May, yeah.

 5   Q.  Okay.  Have we talked about all of the comments by Dr.

 6       Hockenberry?

 7   A.  Yes.

 8   Q.  Okay.  Did Dr. Hockenberry ever make any comments about

 9       your national origin?

10   A.  Those kind of thing we have to be very careful of, but

11       you can feel it, because I never could native tongue,

12       and she said, Very difficult to communicate with you

13       and you don't listen, and never accept what I want to

14       say.  I always brought.  I never all to myself.  I

15       never had chance to explain what happened and what did

16       happen, so frustrating, and if she just talk just my

17       way, I just dah-dah-dah, then good, it's end.

18   Q.  So --

19   A.  So frustrating.

20   Q.  I understand that you had frustrating -- you were

21       frustrated by Dr. Hockenberry.

22   A.  Uh-huh.

23   Q.  Did anybody ever make any comments about your national

24       origin?

25   A.  Not -- they cannot say national, but Kim Fisher said
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 22 of 31

```
 1        I'm the worst person to communicate and --
 2   Q.   Do you know whether that had to do with communication
 3        styles?
 4   A.   She said worst -- worst person to communicate.  That
 5        means communication.  But then I ask Kim Fisher and I
 6        wrote somewhere, Kim Fisher took one-month vacation and
 7        she didn't ask me anything, notify anything, even she
 8        want to have some portion of the grant money, and she
 9        change the CRC, Clinical Research Coordinator, but I
10        never get notification prior to her change it and --
11   Q.   So --
12   A.   Yeah, I live in dark actually, yeah.
13   Q.   So difficulty communicating -- Kim Fisher didn't
14        communicate that she was going to be away for a month;
15        is that correct?
16   A.   Difficult communication.  She -- Kim Fisher complain
17        about me, I'm always worst communicator, person to
18        communicate.  But to me, actually Kim Fisher was worst
19        communicate also, because she just need room.  I don't
20        know why she just need room, maybe -- I don't know,
21        maybe personal reason, but anyway, she just need room,
22        and then she just complain.  So actually I just take
23        back, and even -- you didn't mention anything I was
24        difficult as well, yeah.
25   Q.   Okay.  Any other comments?
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 23 of 31

```
 1   A.   Comment for?

 2   Q.   Comments related -- so there weren't any overt comments

 3        about your national origin; is that correct?

 4   A.   I don't think so.

 5   Q.   Okay.  How do you think you were treated differently

 6        because of your national origin?

 7   A.   Because I didn't have any chance to talk, explain

 8        myself, and when I meet with Hockenberry on the

 9        hallway, she just turn around and she went different

10        direction, and there was always very underestimating

11        and just ignoring, and I don't know why.

12   Q.   You don't know why she acted that way toward you?

13   A.   No.  I'm not sure really helpful information, but if

14        you have chance to talk to any faculty in School of

15        Nursing at Duke, they will tell you Dean Broome is a

16        racist.

17   Q.   Okay.  Who will say that?

18   A.   For example -- who was that?  After I resign, I heard

19        from -- through Im, Dr. Im, that Dean Broome is a

20        racist.

21   Q.   Do you have any evidence to support that?

22   A.   If you ask Dr. Im, she will tell you, yeah.  I cannot

23        remember.

24   Q.   And Dr. Im -- you guys go to the same church, correct?

25   A.   No.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 24 of 31

```
 1   Q.   Okay.  You've answered my question.

 2   A.   Okay.

 3             MS. LEHMAN:  Let's take five minutes, if we

 4        could.

 5             (Brief recess)

 6   Q.   Back on the record.  Anything else that you wanted to

 7        clarify about your testimony?

 8   A.   Maybe concern by some others.  I thinking about maybe

 9        from Marilyn Hockenberry's people, through her staff,

10        Marilyn Hockenberry's staff, because different system

11        and looks very like a labor union kind of thing.  So

12        usually they want to attend my meeting, and phone

13        conversation with somebody, they want to participate.

14        I didn't have any privacy.

15   Q.   So who would -- who would ask to be on phone calls in

16        meetings?

17   A.   Well, for example, when I had opportunity to call NIH

18        program officer, Marilyn Hockenberry want to

19        participate in phone call conversation, because she

20        afraid I will speak bad, badly.

21             And then when I had project meeting with

22        colleague, weekly project meeting, Phyllis or Heathers,

23        they want to attend the meeting.  So as a PI, I didn't

24        have much independent, freedom.

25   Q.   Okay.
```

Case 1:18-cv-00288-WO-JLW  Document 20-1  Filed 04/11/19  Page 25 of 31

```
 1   Q.   Okay.  And did they reverse any decision taking

 2        action --

 3   A.   No, exactly same.

 4   Q.   Okay.  Do you have any knowledge of any of the alleged

 5        comments or false statements -- alleged false

 6        statements by Hockenberry being disseminated to anyone

 7        outside of Duke?

 8   A.   I don't have idea.  You mean Hockenberry try to

 9        disseminate my situation, my case to anybody outside of

10        Duke?

11   Q.   No.  My question is, with respect to the allegedly

12        false statements made by Hockenberry --

13   A.   Uh-huh.

14   Q.   -- do you have any knowledge that she made those

15        statements to anyone outside of Duke?

16   A.   I don't know.

17   Q.   Okay.  And do you have any knowledge that any allegedly

18        false statements by Hockenberry are still being made?

19   A.   I don't believe I do.  To maybe Duke or outside of

20        Duke, right?

21   Q.   Yes.

22   A.   I don't know.

23   Q.   Other than Dr. Im, do you have any other witnesses who

24        will testify to the alleged statements by Dr.

25        Hockenberry?
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 26 of 31

```
 1   Q.   Okay.  Did you tell -- so you -- am I correct that your
 2        testimony is that you didn't have any discussions with
 3        Dr. Turner as to why you thought you were being treated
 4        unfairly?
 5   A.   Nobody knows, just Barbara Turner -- even -- she -- she
 6        didn't want to talk maybe and -- I don't know.
 7   Q.   Did she turn you away?
 8   A.   She turn away?
 9   Q.   Did Dr. Turner not want to listen to you?
10   A.   No, she listen, but she's kind of mediator between
11        Marilyn Hockenberry and me and she just listen what I'm
12        saying and she just listen what Marilyn Hockenberry
13        say.  But Barbara show good support to me.
14   Q.   Okay.  I'm going to switch gears for a little bit here.
15             Are you -- I understand you are currently
16        employed, correct?
17   A.   UNLV, yes.
18   Q.   At UNLV, and when did you get hired into that job?
19   A.   August 1, 2018.
20   Q.   That was your start date?
21   A.   Yes.
22   Q.   Okay.  And what is your job title there?
23   A.   It is at the same as Duke University, Associate
24        Professor without tenure.
25   Q.   What's your immediate supervisor's name at UNLV?
```

Case 1:18-cv-00288-WO-JLW  Document 20-1  Filed 04/11/19  Page 27 of 31

```
 1   A.   She listen and she has eye contact, but she avoid eye

 2        contact with me and she didn't listen.

 3   Q.   Okay.  And the inner circle, we're talking about

 4        Phyllis and Heather?

 5   A.   There is a whole staff members, research staff members,

 6        and faculty member, research junior faculty member, she

 7        mentor (inaudible), yes.

 8   Q.   Okay.  How many interactions did you have with Dean

 9        Broome?

10   A.   Very rare.

11   Q.   Okay.

12   A.   When I get appointment, I have interview, and after I

13        get appointment, I had lunch with Dean Broome and the

14        two other new faculty.  I think that's all.

15   Q.   Okay.  I understand that you disagree with the concerns

16        that Dr. Hockenberry raised about your work

17        performance, but is it reasonable for her to raise

18        concerns about work performance or perceived security

19        issues or perceived protocol deviations?  Is that

20        within her job role?

21   A.   Absolutely her job, and that's her good reason to give

22        hard time to me.  She keep saying that she has to --

23   Q.   My question --

24   A.   -- protect school, yes.

25   Q.   Okay, okay.  So she -- her -- she would say that to
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 28 of 31

```
 1       you?

 2   A.  Yes.

 3   Q.  Okay.  That her -- part of her role was to protect the

 4       university?

 5   A.  Right.

 6   Q.  Okay.  I'm sorry, I wasn't trying to cut you off there;

 7       I was just --

 8   A.  Right.

 9   Q.  What about Dr. Fisher, does she have sort of an

10       obligation to also consider and protect security or

11       safety issues?

12   A.  Yes.

13   Q.  Not going to come quite as fast and furious, but a few

14       more documents.

15               (Exhibit No. 14 was marked for identification

16       by the reporter.)

17   Q.  Dr. Cho, the court reporter has handed you what's been

18       marked Exhibit 14.  Do you recognize this?

19   A.  Yes.

20   Q.  All right.  And what is it?

21   A.  Question from you or somebody, your company, right?

22   Q.  Is this a document that you filed, that your attorney

23       filed?

24   A.  I answer and then I gave to my attorney.

25   Q.  Okay.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 29 of 31

```
 1   A.   Yes.

 2   Q.   Are there -- and by colleagues, other than Dr. Im and

 3        the staff, is there anyone else that you're aware she

 4        made that comment to?

 5   A.   No.

 6   Q.   Okay.

 7   A.   I don't believe so.

 8   Q.   When was your last day of work at Duke?

 9   A.   June 30 officially, but I had some vacation day.

10   Q.   Okay.  And you used those to move to Las Vegas?

11   A.   Yes.

12   Q.   Okay.  Had you ever filed a complaint of national

13        origin discrimination prior to against Duke?

14   A.   I'm sorry?

15   Q.   Had you ever -- with any of your prior employers, had

16        you ever alleged national origin discrimination?

17   A.   No, no.

18   Q.   Were you aware of national origin discrimination?

19   A.   I got to know, yeah, what is national origin, yeah,

20        depending on where the person came from, treat them

21        differently.

22   Q.   Okay.  And when did you learn about that?

23   A.   Through this EEOC case.

24   Q.   Through the EEOC case?

25   A.   Yeah, at Duke, uh-huh.
```

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 30 of 31

| | | |
|---|---|---|
| 1 | Q. | Okay. |
| 2 | A. | Uh-huh. |
| 3 | Q. | And so then when you filed your EEOC Charge is when you |
| 4 | | raised that as -- the concern? |
| 5 | A. | Yes, and I thought that retaliation is more serious |
| 6 | | than national origin, but I have to do something |
| 7 | | discrimination. |
| 8 | Q. | Okay.  And just so I'm clear, you felt and had raised |
| 9 | | concerns that you thought you were being treated |
| 10 | | unfairly with the Faculty Hearing Committee, but the |
| 11 | | first time you raised national origin was when you went |
| 12 | | to the EEOC, correct? |
| 13 | A. | Yes, correct, yes, uh-huh. |
| 14 | Q. | Okay.  Is there anything that you believe is important |
| 15 | | about your case that we haven't talked about today? |
| 16 | A. | I think we cover a lot, yes. |
| 17 | Q. | Okay.  You think you've had enough questions for the |
| 18 | | day. |
| 19 | A. | One thing I want to emphasize you on.  I didn't have |
| 20 | | any chance to consulate (phonetics) between Marilyn |
| 21 | | Hockenberry myself by Dean Broome, especially when we |
| 22 | | have this kind of conflict to be working, as a Dean or |
| 23 | | somebody try to consulate between two person, I think |
| 24 | | you miss some of this part and you miss some of this |
| 25 | | part.  For our school, you better work together more |

Case 1:18-cv-00288-WO-JLW   Document 20-1   Filed 04/11/19   Page 31 of 31