IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JUNE CHO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:18-cv-00288-WO-JLW |
| | ) |
| DUKE UNIVERSITY and MARILYN | ) |
| HOCKENBERRY | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DECLARATION OF BARBARA TURNER

1. My name is Barbara Turner. I am over the age of 18 and am competent to make this Declaration which is based on my own personal knowledge and I give this Declaration as part of the lawsuit brought by June Cho ("Dr. Cho").

2. I am the Elizabeth P. Hanes Professor of Nursing and Chair of the Health of Women, Children, and Families Division of the Duke University School of Nursing. I have held this position since 2015. In this role, my direct supervisor was Associate Vice Dean Beth Merwin. The Dean of the School of Nursing is Dr. Marion Broome. In my role as Division Chair, I served as Dr. Cho's direct supervisor.

3. In late February or early March 2016, I was made aware of inappropriate comments Dr. Cho made to her research staff. As an employee of Duke, Dr. Cho was expected to treat her staff with respect and professionalism. As Dr. Cho's direct supervisor, I counseled Dr. Cho regarding appropriate workplace interactions and expectations. I documented the conversation and topics/statements discussed on or around the time of my meeting with Dr. Cho. A true and correct copy of my discussion notes is attached as **Attachment A**.

4. On or about May 31, 2016, I attended a meeting with Dr. Cho and Duke statisticians Dr. Wei Pan and Dr. Qing Yang. During the meeting, I was made aware that Dr. Cho had become upset when the statisticians had not found significant findings and wanted them to rerun the data to find significance. Dr. Cho no longer wanted to work with Duke's statisticians and requested to work

with someone outside of Duke. I relayed the substance of this conversation to Marilyn Hockenberry and, at some point later, to Dean Broome. It gave pause and raised the question as to why Dr. Cho would want to work with someone outside of Duke and whether that person was someone over whom she may have significant influence.

5. On or about July 2016, I was made aware of additional inappropriate behavior by Dr. Cho concerning a member of her research staff who required time away for medical reasons. I again counseled Dr. Cho and discussed that the reason for an employee's medical absence is not an appropriate area of inquiry. At this time, I shared with Dr. Cho that the feedback I received was that her "team feels bullied and not appreciated." I documented the conversation and topics/statements discussed on or around the time of my meeting with Dr. Cho. A true and correct copy of my discussion notes is attached as **Attachment B**.

6. On or about mid-November 2016, I was alerted to the fact that Dr. Cho had re-opened enrollment for her study at UAB without amending the Duke IRB or informing the regulatory coordinator on her study at the time, Dr. Kim Fisher. I attending a meeting with Dr. Cho, Dr. Hockenberry, Dr. Fisher, and Ms. Kennel where this issue and others were discussed. Dr. Cho was informed that an audit by Duke's Office of Audit, Risk and Compliance had been requested.

7. I understand that Dr. Cho now contends that I gave her "verbal" approval to re-open enrollment at UAB. This is false. I did not give approval, nor would I have the authority to give approval to re-open an external site or make any other deviations from the approved IRB protocol. An amendment needs to be submitted to Duke's IRB for review and approval given for any changes.

8. On or about December 2016, I was made aware that Dr. Kim Fisher, Director of the Neonatal-Perinatal Research Unit ("NPRU") no longer felt comfortable working with Dr. Cho. I also learned that Duke's IRB intended to conduct a full board review of the study.

9. On or about January 2017, I attended a meeting with Dean Marion Broome and other department leadership wherein the audit, NPRU's decision to disassociate from the study, and the intent of Duke's IRB to conduct a full board review were discussed. Dean Broome determined that Dr. Cho's faculty appointment would not be renewed.

10. At the end of February 2017, Duke's Office of Audit, Risk and Compliance completed the audit of Dr. Cho's study. The audit noted deviations from the approved IRB protocol. Specifically, the report noted "non-IRB-approved study visits were attempted/completed at the subjects' residence" and two saliva samples were obtained prior to receiving documented consent.

2

11. I met with Dr. Cho on or about March 8, 2017, at her request to discuss the audit. Dr. Cho said she thought the issues identified in the audit and submitted to the IRB were "trivial." I tried to explain that they were not trivial and also tried to underscore that the IRB full board had not yet conducted its review. Dr. Cho did not want to hear this and said only that she intended to file a grievance against Dr. Hockenberry who had submitted the audit request. It should be noted that Dr. Cho's husband showed up with her at this meeting. I asked him to sit in a waiting area, he objected and shoved past me into my office. When I said the meeting was cancelled, he relented and went to the waiting area. When Dr. Cho and I walked out after the meeting, her husband verbally attacked and berated me such that I was fearful that I might be struck. I documented the conversation and topics/statements discussed on or around the time of my meeting with Dr. Cho and the interaction with her husband. A true and correct copy of my discussion notes is attached as **Attachment C**.

12. I met with Dr. Cho on or about April 12, 2017, and provided her a letter from Dean Broome stating that her faculty appointment would not be renewed following the 2017-2018 academic year concluding on June 30, 2018. We discussed options for leaving early. I indicated my belief that she would be attractive to other institutions were she to seek to transfer her grant as she had done upon coming to Duke. I also provided a severance option. Dr. Cho said she was not interested.

13. After I communicated to Dr. Cho that her faculty appointment would not be renewed, I was contacted by the Faculty Ombuds regarding the timing of the non-reappointment decision. I informed him that the decision was made in January, Duke's Office of Counsel was consulted in February, and legal reviewed the documentation the first week of March 2017. Dr. Cho's filing of her grievance had nothing to do with the decision not to renew her faculty appointment.

14. On or about May 9, 2017, the Duke IRB full board recommended revocation of Dr. Cho's Principal Investigator or "PI" status. The Dean of the School of Medicine at the time, Nancy Andrews, was the designated Institutional Official with authority to make a determination based on the IRB's recommendation. Dr. Andrews adopted the IRB's recommendation.

15. Thereafter, Dean Broome, in consultation with department leadership, determined the grant should be returned to NIH. This was communicated at the end of May 2017. To my knowledge, Dr. Hockenberry was not part of this discussion or decision.

16. In June 2017, Dean Broome, Phyllis Kennel, Dr. Fisher, Dr. Hockenberry and I attended the Faculty Hearing Committee hearing of Dr. Cho's grievance. The Committee issued its unanimous decision in July 2017 that Dr. Cho was <u>not</u> the

3

subject of impermissible harassment or academic due process violations. Importantly, the Committee's decision noted that Dr. Cho utilized the term "harassment" to refer to alleged "general mistreatment by administration that she found detrimental to her research," not harassment based on national origin or any other protected category. It is my understanding that the Faculty Hearing Committee's decision was upheld at all levels of internal appeal pursued by Dr. Cho.

17. On or about August 2017, I was made aware that Dr. Cho filed a charge with the Equal Employment Opportunity Commission alleging national origin discrimination and retaliation. It is my understanding that the EEOC did not find a violation and dismissed the case. To my knowledge, this is the first time that Dr. Cho alleged national origin discrimination. At no time prior had Dr. Cho raised or expressed any concern to me that she felt discriminated against because of her national origin.

18. Dr. Cho continued in her role as a faculty member until on or about May 2018 when she left Duke to take a position with another university. Duke paid Dr. Cho through her appointment term.

19. I understand that Dr. Cho contends that Duke discriminated against her on the basis of her national origin (Korean). I did not and do not harbor any discriminatory animus toward Dr. Cho because of her national origin. I did not take action concerning Dr. Cho because I believed she had raised concerns about national origin discrimination. I am not aware of anyone making any derogatory comments or remarks regarding Dr. Cho's national origin.

20. At the time of Dr. Cho's employment with Duke, there were three (3) other School of Nursing research faculty who identify as Korean. These individuals did not have any similar issues and have thrived in their research. Two continue to serve as the PI on their own grants and the third is a successful collaborator on a grant. All three remain employed with Duke University School of Nursing.

21. I understand that Dr. Cho alleges that I was "controlled by" or took action as instructed by Dr. Hockenberry. This is patently false. I respect Dr. Hockenberry as a colleague, but I act and speak of my own accord. At no time was I pressured or influenced by Dr. Hockenberry to do or say anything contrary to my own beliefs.

[Signature Page Follows]

4

## DECLARATION PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

_____
Barbara Turner

Date: 8 April 2019

# ATTACHMENTS TO THE DECLARATION OF

# BARBARA TURNER

Dr Cho

In our conversation said that she told her research assistant that she would have to sell her house and move closer to Duke so she could be available to June on evenings and weekends.

Counseled her she could not direct that, nor ask about personal issue, illness of husband, or give her advice not to attend medical school and she needs to attend to her husband that is her personal and life issues to manage.

Cannot ask about illness issues

Staff report to Phyllis not her

Not in note but I do remember that she railed against them reporting to Phyllis because she then could not control them and I explained the rationale for that decision being Duke wide not just DUSON. She settled down once she heard it was Duke wide- not happy but better able to accept it.

**CONFIDENTIAL**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**DUKE000852**

A

June's conversation with Phyllis- Phyllis said plan for unexpected emergencies- she is unable to help with coverage

Me- Phyllis cannot step in to over for staff absences- investigator should be able to step in

Not Phyllis's' responsibility to see that research data gets collected.

Alicia – data technician- was II admitted to hospital – will share infor when she is back- limitation of study ( hospitlaizations)

June wanted to know why Alicia was out what surgery- talked about differing expectations – Alicia's personal life is hers- June cannot ask about it.

June- tries to do her best; 2 people out at the same time- how can you do this better for me

She had a good team in Alabama- would she be happier there- no

I discussed that her team feels bullied and not appreciated

Multiple meetis with Phyllis an June to talk about ineractions with her and the research teasm

Recommendations to June

1. Have the staff notify you(in addition to Phyllis) if they will be out
2. Work on research team interactions
3. Cannot pry
4. Treat people with respect
5. If team member is absent there is no one to take their place

Phyllis give hint of problems( I do not understand what I meant)

B

CONFIDENTIAL

DUKE000851

Case 1:18-cv-00288-WO-JLW   Document 20-5   Filed 04/11/19   Page 8 of 10

08 March 2017

Memo for Record

Dr Cho requested a meeting with me to discuss "post audit findings" She asked that her husband also attend and I said no; this was communicated to her by Ms Goss who set up the meeting.

June arrived on time at my office and her husband walked in- I introduced myself and said hello and then invited him to sit in the 3rd floor area to wait for June He insisted in being in on the meeting; I said no- I meet with faculty members alone to discuss their concerns about research. He again insisted- I said the meeting is then cancelled – thank you for coming by but this meeting will not happened with you in attendance. June told him to wait outside my office - he was unprofessional with Angela ( by her report) who showed him where he could wait.

June started the meeting by saying she was reporting Dr Hockenberry to the "University Grievance, Harassment and Disrespect Committee" for harassment of her as PI. She had a two page bulleted document that I did not ask to see and she did not share with me. I asked what she wanted from filing this with the committee – she wants the harassment and bullying to stop. I was not familiar with the committee; she said it was OIE and she had been to talk with them and then said to go to Grievance Committee. She also wants to report Marilyn to NIH. We talked about parsing out what were the issues- there are two- personal harassment and then lack of systems in place for new researchers to know how to handle their research;. She said once she got the IRB audit finding that there were no issues beyond trivial matters it was clear that this was harassment. We discussed this further and she noted that the IRB told her they did not care about the trivial (trivial was a repeated theme) findings- the findings were non compliant not deviations. I clarified that she had not gone to the IRB yet – she had not- we went over her letter to NIH and she confirmed that she had not heard back from them about approval on the changes. I reconfirmed that she does not go to the Duke IRB before she hears from NIH. I then asked for examples on the personal harassment- if she wanted to share- if not it was fine. The one she stated was that Marilyn and Kim were laughing at her- Marilyn said she (June) does not know anything; what is she doing here and they both laughed- I was at the meeting and do not remember that at all and relayed that to her. I encouraged her to go to the dean as the next step before filing and that was her plan.

I then walked her to meet up with her husband and he started verbally attacking me- do you know this and that. He asked if I knew she was writing another R01 (he is a retired faculty member in pharmacology at UNC); I did not; he said cannot go through Marilyn's shop because she will sabotage it. I said that would not happen. He got more irate ( I thought I was going to be hit) and I said this conversation is now over and wished them both a good day.


PLEASE NOTE: In the middle of the meeting with June in my office- some electronic device started talking (options are my ipad, my iphone, my office phone, or my computer)- I said to June stop talking. I

C

**CONFIDENTIAL**  DUKE000853

Case 1:18-cv-00288-WO-JLW   Document 20-5   Filed 04/11/19   Page 9 of 10

retrieved my iphone and my ipad and showed her that both were off as was my computer. I repeated to her not to say anything.

We moved to a conference room to complete the conversation. She asked if I was recording the conversation I said no- as I showed you I have no idea where the voice emanated from and to be safe we are in a location distant from those devices. It will be interesting to see if this comes up in conversation.

**CONFIDENTIAL**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　DUKE000854

Case 1:18-cv-00288-WO-JLW   Document 20-5   Filed 04/11/19   Page 10 of 10