IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JUNE CHO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-00288-WO-JLW |
| | ) | |
| DUKE UNIVERSITY and MARILYN | ) | |
| HOCKENBERRY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT

Defendants Duke University ("Duke") and Marilyn Hockenberry ("Hockenberry")

(collectively "Defendants") file this memorandum in support of summary judgment.

## NATURE OF THE CASE

Plaintiff June Cho was a professor and researcher with the Duke University School

of Nursing. Dr. Cho asserts claims of national origin discrimination and retaliation under

Title VII of the Civil Rights Act of 1964 and North Carolina common law against Duke

University. She asserts claims of defamation and tortious interference with contract against

individual defendant Dr. Marilyn Hockenberry who was the Associate Dean for Research

and Clinical Research Unit Director during the timeframe relevant to Plaintiff's claims.[1]

---

[1] Dr. Hockenberry is currently Professor Emeritus with Duke and a Professor of Pediatrics with Baylor College of Medicine. (Hockenberry Decl.¶2). She remains employed part-time by Duke as an IRB Chair. (*Id.*).

In July 2015, Dr. Cho came to Duke as the Principal Investigator on a National Institutes of Health ("NIH") research grant involving premature infants. Federal regulations require that Duke maintain stringent oversight of human subject research. Dr. Cho, however, viewed those in compliance roles as interfering with her research. Multiple individuals in various departments lost confidence in Dr. Cho: (i) the Neonatal-Perinatal Research Unit declined to continue working with Dr. Cho; (ii) the Dean of the School of Nursing declined to renew Dr. Cho's faculty appointment; (iii) Duke's Institutional Review Board which oversees all human subject research recommended removal of Dr. Cho's status as a Principal Investigator; and (iv) ultimately, the School of Nursing returned the grant to NIH. Dr. Cho continued in her faculty role through her appointment term.

Dr. Cho's national origin discrimination and retaliation claims against Duke fail as a matter of law. Dr. Cho can present no evidence of national origin discrimination and Dr. Cho's own testimony demonstrates that she did not complain of national origin discrimination until *after* the acts she contends were retaliatory.

Dr. Cho's defamation claim against Dr. Hockenberry is based on incorrect assumptions and inadmissible double-hearsay. To the extent Dr. Hockenberry reported concerns about Dr. Cho's work and performance, she was obligated to do so in her role as Clinical Research Unit Director and is entitled to a qualified privilege.

Dr. Cho's tortious interference claim against Dr. Hockenberry is similarly fatally flawed. Because Dr. Hockenberry is a non-outsider to the alleged contract, Dr. Cho must prove actual malice. There is no evidence of malice.

Defendants are entitled to judgment as a matter of law on all claims.

2

## STATEMENT OF THE FACTS

### A. Dr. Cho's Hire

Duke University School of Nursing hired Dr. Cho as an Associate Professor without tenure beginning July 1, 2015. (Cho p.22, Ex.2).[2] School of Nursing Dean Marion Broome hired Dr. Cho. (Broome Decl.¶3). During the relevant timeframe, Dr. Cho's direct supervisor was Division Chair Barbara Turner. (Turner Decl.¶2).

Prior to joining Duke, Dr. Cho was a faculty member at the University of Alabama at Birmingham ("UAB"). (Cho p.19). While at UAB, Dr. Cho completed the first year of a five-year NIH research grant. (Cho p.19; Hockenberry Decl.¶8). Dr. Cho served as the Principal Investigator ("PI") on the study. (Cho p.19). When Dr. Cho joined Duke, the grant transferred to Duke. (Hockenberry Decl.¶8). Dr. Cho remained the PI, but Duke became the holder of the grant with ultimate responsibility for ensuring compliance with all applicable federal regulations. (Cho p.25; Hockenberry Decl.¶8).

### B. Compliance Oversight and Reporting Structure New to Dr. Cho

At Duke, human subject research is subject to multiple layers of oversight.

**The Institutional Review Board (IRB)**: One layer is the Duke Institutional Review Board ("IRB"). The IRB's mission is to ensure the protection of human research subjects. (Hockenberry Decl.¶3; Swamy Decl.¶3). All study protocols must be reviewed and

---

[2] Plaintiff's deposition testimony is cited by her last name "Cho" and page number. Deposition exhibits are cited by their number. Plaintiff did not depose any of Defendants' witnesses. Declarations of Defendants' witnesses are cited by declarant's last name and paragraph number.

approved by the IRB from the outset. (Hockenberry Decl.¶3; Swamy Decl.¶3). Any changes to the protocols along the way must also be submitted and approved prior to implementation. (Hockenberry Decl.¶3; Swamy Decl.¶3). IRBs are not unique to Duke; IRBs exist at other institutions. (Hockenberry Decl.¶3; Swamy Decl.¶4).

**Clinical Research Units (CRU)**: Clinical Research Units ("CRUs") provide another layer of oversight. (Hockenberry Decl.¶6). The CRUs ensure research integrity and compliance with all state, federal, and institutional regulations and policies. (Hockenberry Decl.¶6). They also provide direct supervision of research staff. (Hockenberry Decl.¶6).

During the relevant timeframe, Dr. Marilyn Hockenberry was the School of Nursing Associate Dean for Research and Clinical Research Unit Director. (Hockenberry Decl.¶5). In this role, Dr. Hockenberry supervised Phyllis Kennel who was the Research Practice Manager (a CRU position) assigned to Dr. Cho's study. (Hockenberry Decl.¶7). Dr. Cho's research staff reported directly to Ms. Kennel. (Hockenberry Decl.¶¶6-7). This reporting structure is intended to avoid concern of undue influence by a PI, which may be more likely to occur in a centralized power structure. (Hockenberry Decl.¶6).

The CRU structure was "totally new" to Dr. Cho because at UAB "only the PI met with research staff." (Cho p.32). Dr. Cho believed the additional oversight and involvement of Ms. Kennel and Dr. Hockenberry in supervision of her staff was an invasion of her privacy and restricted her independence. (Cho p. 152). Dr. Cho called Ms. Kennel the "boss of labor union." (Cho p.31).

4

**Neonatal/Perinatal Research Unit (NPRU):** Besides these institutional oversight bodies, Dr. Cho's research required sign-off from the Neonatal-Perinatal Research Unit ("NPRU") because the study involved obtaining saliva samples from premature infants. (Fisher Decl.¶3). When Dr. Cho first arrived at Duke, NPRU Director Kimberley Fisher reviewed the study protocols. (*Id.*). Dr. Fisher then met with Dr. Cho and tried to explain that some protocols contradicted the standard of care practices for Duke's neonatal intensive care unit and special infant care unit. (*Id.*). For example, Dr. Fisher explained that premature infants are fragile, and it may not be feasible to obtain multiple saliva samples at 15 minute intervals as stated in the protocol. (*Id.*). Dr. Fisher also explained that, because of space, some infants who are stable may be moved to another facility prior to reaching 40 weeks when the final pre-discharge sample was to be collected under the protocol. (*Id.*). Dr. Cho was not receptive to these concerns and would not agree to any alteration of the protocol. (*Id.*). Based on Dr. Cho's inflexibility and responses, Dr. Fisher did not feel comfortable providing Dr. Cho a Study Coordinator from her unit who would be responsible for study-related matters. (*Id.*). Dr. Fisher deferred to the School of Nursing to provide a Study Coordinator. (*Id.*).

## C. Dr. Cho Counseled Regarding Treatment of Staff

The School of Nursing identified a former neonatal intensive care unit nurse, Becky Jones, to take on the role of Study Coordinator for Dr. Cho. (Fisher Decl.¶4; Hockenberry Decl.¶10). Ms. Jones reported directly to Ms. Kennel. (Hockenberry Decl.¶10).

Research staff positions are funded by grant money. (Kennel Decl.¶6). This means that a 50% staff member for a particular study would be expected to work twenty (20)

hours per week on the study and would receive half of his/her salary from the grant funding for that study.[3] (*Id.*). Dr. Cho hired Ms. Jones at 50% effort. (*Id.*). By all accounts, including Dr. Cho's, Ms. Jones did a very good job and recruited a significant number of subjects for the study. (Cho p.60; Kennel Decl.¶6). However, Ms. Jones informed Ms. Kennel that she was working far more than 20 hours per week to keep up with Dr. Cho's demands. (Kennel Decl.¶6). Ms. Kennel and Dr. Hockenberry addressed the issue with Dr. Cho who was more than willing to accept the extra effort by Ms. Jones, but was reticent to pay for it; Dr. Cho eventually agreed to increase Ms. Jones' effort level for a period of time. (Kennel Decl.¶6; Cho p. 60).

In the Spring of 2016, Dr. Turner counseled Dr. Cho regarding inappropriate comments to staff including: inquiries into details of a husband's illness; telling a staff member she would need to sell her house to move closer to Duke so she could be available on evenings and weekends; and discouraging Ms. Jones from attending medical school at ECU as planned because Dr. Cho did not view it as prestigious. (Tuner Decl.¶3, Attachment A). Dr. Turner documented her discussion. (*Id*.).

Dr. Turner also documented a later discussion addressing issues related to a data technician's time away for surgery. (Turner Decl.¶5, Attachment B). Dr. Turner shared with Dr. Cho that her "team feels bullied and not appreciated." (*Id*.).

Dr. Cho also had a difficult time maintaining a good relationship with laboratories to process the study specimens. (Kennel Decl.¶10). On or about May 2016, Dr. Cho

---

[3] Staff time may be allocated to various studies to achieve 100% if full-time employment is their goal.

decided she would like to send her samples to UNC Chapel Hill, which marked lab number four. (Kennel Decl. ¶10).

On or about May 31, 2016, Dr. Cho also asked to have the Duke statisticians taken off her study. (Cho p.70-71). Dr. Cho became upset with the Duke statisticians when they had not found significant findings and she wanted them to rerun the data to find significance. (Turner Decl.¶4). Dr. Cho wanted to utilize the statistician she worked with at UAB who was now at University of Texas El Paso. (Cho p.71). Dr. Hockenberry reminded Dr. Cho that the individual would need to be hired through a subcontract, the IRB would need amendment, and a proper data transfer agreement would need to be put in place. (Hockenberry Decl.¶11, Attachment C). Dr. Cho retorted that she intended to list this individual as a "consultant" on her study, as she had done while at UAB. (*Id.*). Dr. Hockenberry responded that Dr. Cho still needed to address the data being sent outside Duke both to the statistician and the laboratory. (*Id.*)

### D. Dr. Cho Reopens Enrollment at UAB Without Notifying Duke

Study coordinator Becky Jones submitted her resignation effective July 15, 2016, to attend medical school. (Fisher Decl.¶5). Prior to leaving, Ms. Jones asked NPRU Director Dr. Fisher to assume an active role in the study out concern for staff, given the treatment she had experienced. (*Id.*). Dr. Fisher agreed to do so conditioned on Dr. Cho's assurance that communication with NPRU staff would go through her. (*Id.*).

Dr. Cho complained about the work of Dr. Fisher's staff and low recruitment numbers for her study. (Fisher Decl.¶6). Dr. Fisher explained that the neonatal intensive

care unit census was unusually low, thus, there was simply not a large pool to draw from to find candidates who met the study criteria. (*Id.*).

Taking matters into her own hands, on or about August or September 2016, Dr. Cho contacted UAB to re-open active enrollment of new study participants at that site. (Fisher Decl.¶7). This happened behind Duke's back and was learned only through happenstance because one of Dr. Fisher's employees spoke with a coordinator from UAB at a conference. (*Id.*).[4] The Duke IRB approved study protocol in place **permitted only follow up with subjects previously enrolled at UAB, not recruitment of new participants**. (Hockenberry Decl.¶12). When questioned, Dr. Cho commented to the effect of "Duke thinks it needs to know everything." (Fisher Decl.¶7). Because Duke had ultimate responsibility to ensure the integrity of the study and compliance with all regulations, Duke *did* need to know and Dr. Cho's failure to obtain Duke IRB approval was significant. (*Id.*).

Besides the unauthorized reopening of enrollment at UAB, there were concerns that Dr. Cho was utilizing videos from a different research study at UAB to train her staff which would also require proper documentation, agreements and IRB approval. (Hockenberry Decl.¶12).

Dr. Hockenberry consulted with the Vice Dean for Clinical Research at the time, Dr. Mark Stacy. (Hockenberry Decl.¶13). Dr. Stacy suggested Dr. Hockenberry reach out to Duke's Office of Audit, Risk and Compliance to audit the study as a first step. (*Id.*). The

---

[4] To the extent Dr. Cho now contends that she received "verbal" approval from Dr. Turner to reopen enrollment at UAB (Cho p.54), Dr. Turner denies this assertion. (Turner Decl.¶7). Moreover, Dr. Turner does not have such authority as reopening enrollment at an external site would require Duke IRB approval of an amendment to the protocol. (*Id.*).

audit was requested in mid-November 2016. (*Id.*). Pending the results of the audit, solicitation of new study subjects was placed on hold at Duke and UAB. (*Id.*).

**E. NPRU Disassociates with Dr. Cho's Research**

Dr. Fisher believed Dr. Cho's reopening of enrollment at UAB without Duke IRB approval and without informing her as the coordinator on the project showed a disregard for rules and regulations applicable to research. (Fisher Decl.¶8). Dr. Fisher consulted with her supervisors and it was determined NPRU would no longer work with Dr. Cho. (*Id.*). In December 2016, Dr. Fisher informed the School of Nursing of the decision. (*Id.*). The NPRU is a "closed unit" for research meaning that all research done in the neonatal intensive care unit must come through the NPRU. (*Id.*). Thus, the unit's decision to disassociate with Dr. Cho effectively ended enrollment at Duke. (*Id.*).

**F. School of Nursing Dean Decides Not to Renew Dr. Cho's Contract**

In January 2017, School of Nursing Dean Marion Broome was informed of Dr. Cho's re-opening enrollment at UAB, NPRU's decision to disassociate from the study, the impending audit, and the intent of Duke's IRB to conduct a full board review of Dr. Cho's study. (Broome Decl.¶4). Dean Broome who participated in the initial hiring of Dr. Cho, in consultation with department leadership, decided not to renew Dr. Cho's Associate Professor Appointment. (Broome Decl.¶3-4). The department weighed options for timing and communication to Dr. Cho. (Broome Decl.¶4).

9

### G. Audit Results Finds Infractions Dr. Cho Deems "Trivial"

On or about February 28, 2017, Duke's Office of Audit, Risk & Compliance completed its review. (Turner Decl.¶10). The audit noted deviations from the approved IRB protocol. (*Id.*). Specifically, the report noted "non-IRB-approved study visits were attempted/completed at the subjects' residence"[5] and two saliva samples were obtained prior to receiving documented consent. (*Id.*). Dr. Cho mistakenly believed the audit "vindicated" her because there were not major incidents. (*See* Compl.¶20).

On or about March 8, 2017, Dr. Cho requested to meet with Dr. Turner to discuss the audit. (Turner Decl.¶11, Attachment C). Dr. Cho told Dr. Turner she intended to file a grievance against Dr. Hockenberry (who had requested the audit on Dr. Stacy's advice) because the audit and IRB issues were, in Dr. Cho's opinion, "trivial." (*Id.*). Importantly, however, the IRB full board had not yet convened. (*Id.*). Dr. Turner attempted to explain this to Dr. Cho, but to no avail. (*Id.*). Dr. Cho filed a complaint with the Faculty Ombuds concerning alleged violation of her academic freedom and "harassment" unrelated to her national origin or any other protected class. (Cho pp. 102, 194).[6]

### H. Dr. Cho Informed of Non-Renewal

On or about April 12, 2017, Dr. Turner informed Dr. Cho that her appointment would not be renewed after the 2017-2018 academic year ending June 30, 2018. (Turner

---

[5] Dr. Cho does not dispute that home visits were not permitted in the approved Duke IRB protocol. (Cho p.38).

[6] Dr. Cho met with an equal opportunity compliance investigator with Duke's Office for Institutional Equity, but was informed that her complaint did not fall within the office's purview as, by her own testimony, she only raised academic due process and disagreement with Dr. Hockenberry's management style, not unlawful discrimination on the basis of national origin or any other protected category. (Cho pp. 88-92).

10

Decl.¶12). Dr. Turner presented options for timing of the departure and told Dr. Cho she would be highly marketable to other institutions if she sought to transfer the grant. (*Id*.).

The Faculty Ombuds investigated whether the non-renewal might be retaliation for Dr. Cho's stated intent to file a faculty grievance. (Turner Decl.¶13). Dr. Turner explained that the decision had been made in January, options were discussed in February, and in early March proposed language was submitted for review. (*Id*.). Dr. Cho's faculty grievance played no role in the decision. (Turner Decl.¶13).

## I. IRB Full Board Recommends Removal of Dr. Cho's PI Privileges

When the IRB learned of Dr. Cho's reopening enrollment at UAB without approval, NPRU's position regarding non-participation in the study, and of concerns that proper data transfer agreements may not be in place, the IRB requested a full board review. (Swamy Decl.¶5).

Prior to the full board convening, Dr. Hockenberry informed the IRB of an additional incident. On or about March 22, 2017, Ms. Kennel's replacement, Heather Adams, informed Dr. Hockenberry that Dr. Cho had granted a PhD student not approved to work on the study access to a folder containing secure electronic data. (Hockenberry Decl.¶17). Dr. Cho contends that she did not show the PhD student any confidential study data during a meeting in her office as Dr. Hockenberry understood from Ms. Adams was the case. (Cho p.125). However, Dr. Cho asked IT to grant this student access prior to her being approved to work on the study, which in and of itself constitutes a protocol deviation. (Hockenberry Decl.¶17).

11

Unlike a single incident review, the IRB full board looks at the bigger picture history of the study. (Swamy Decl.¶5). The full board of the IRB recommended that Dr. Cho's PI privileges be revoked based on what the board determined was a "pattern of non-compliance." (Swamy Decl.¶5). The IRB submitted its recommendation to the Dean of the School of Medicine Dr. Nancy Andrews.[7] (Swamy Decl.¶6). Dr. Andrews agreed with the IRB's recommendation and informed Dr. Cho that her PI privileges were revoked and reiterated that determination on May 16, 2017. (Swamy Decl.¶6).[8]

## J. Duke Returns Grant to NIH

On or about May 22, 2017, Duke reached out the NIH expressing its desire to relinquish/return the grant as there was not a PI identified to take over the study. (Broome Decl.¶7). Dr. Hockenberry was not the decision-maker and did not learn of the decision until after-the-fact. (Broome Decl.¶7).

## K. Dr. Cho's EEOC Charge Raises National Origin For the First Time

On or about August 11, 2017, Dr. Cho filed a Charge with the Equal Employment Opportunity Commission alleging national origin discrimination and retaliation. (Turner Decl.¶17; Hockenberry Decl.¶22).[9] Dr. Cho admits this marked the first time she raised national origin discrimination:

---

[7] The Dean of the School of Medicine is the designated Institutional Official and final decision-maker with respect to IRB recommendations. (Swamy Decl.¶6).

[8] Dr. Hockenberry was one of several IRB chairs, but did not participate in the full board review or any decision-making regarding recommendations. (Hockenberry Dec.¶19; Swamy Decl.¶7).

[9] Dr. Cho presented her case before a Faculty Hearing Committee. (Hockenberry Decl.¶17). The Committee issued its unanimous decision in July 2017 that Dr. Cho was not the subject of impermissible harassment or academic due process violations. (Id.). Importantly, the Committee's decision noted that Dr. Cho utilized the term "harassment" to

Q. And so then when you filed your EEOC Charge is when you raised that as – the concern?

A. Yes, and I thought that retaliation is more serious than national origin, but I have to do something discrimination.

Q. Okay. And just so I'm clear, you felt and had raised concerns that you thought you were being treated unfairly with the Faculty Hearing Committee, but the first time you raised national origin was when you went to the EEOC, correct?

A. Yes, correct, yes, uh-huh.

(Cho p.194).

**L. Dr. Cho Paid Through Appointment Term**

Dr. Cho took a position as a faculty member with another university beginning in August 2018. (Cho pp.169).[10] Duke paid Dr. Cho through her appointment term that ended June 30, 2018. (Turner Decl.¶18).

## QUESTIONS PRESENTED

1. Whether the Court should grant Duke summary judgment because Plaintiff cannot establish her claims of retaliation or discrimination based national origin and no material questions of fact exist.

2. Whether the Court should grant defendant Dr. Marilyn Hockenberry summary judgment because Plaintiff cannot establish her claims of defamation and tortious interference with contract and no material questions of fact exist.

---

refer to alleged "general mistreatment by administration that she found detrimental to her research," not harassment based on national origin or any other protected category. (*Id.*).

[10] Dr. Cho's last official day with Duke was June 30, 2018, though she utilized vacation to move to Las Vegas before the end of her term. (Cho p.186).

13

<u>**ARGUMENT AND AUTHORITIES**</u>

**I.      Summary Judgment Standard**

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While all facts and the reasonable inferences therefrom must be construed in the light most favorable to the non-moving party, that party only creates a "genuine" issue of fact when she produces evidence that would create a reasonable probability, and not a mere possibility, of a jury finding in her favor. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993). Unsupported speculation cannot defeat a motion for summary judgment. *Evans v. Techs Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

**II.     Dr. Cho's National Origin Discrimination and Retaliation Claims Fail**

Duke is entitled to judgment as a matter of law on Dr. Cho's claims for national origin (Korean) discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and wrongful discharge in violation of North Carolina public policy.[11]

**A.  Dr. Cho's Burdens of Proof**

Where, as here, a plaintiff offers no direct evidence to support her claims, the burden-shifting analysis formulated by the United States Supreme Court in *McDonnell*

_____

[11] The standards applicable to Plaintiff's federal claims govern the resolution of her state-law claim. *See Jones v.*

14

*Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), provides the framework. Under *McDonnell Douglas*, a plaintiff bears the initial burden of making out a *prima facie* case. If the plaintiff does so, "the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory decision. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) (internal quotation omitted), *overruled on other grounds by PriceWaterhouse v. Hopkins*, 490 U.S. 228 (1989). Once the employer articulates a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff who must then show that the nondiscriminatory reason offered by the defendants for the decision is mere pretext. "[I]t is not enough . . . to *dis*believe the employer, the fact finder must [also] *believe* the plaintiff's explanation of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

## B. No Discriminatory Discharge

Dr. Cho cannot establish a *prima facie* case of discriminatory discharge. To withstand summary judgment on this claim, Dr. Cho must demonstrate: (1) she is a member of a protected class; (2) she was performing her job duties at a level that met her employer's legitimate expectations; (3) she suffered and adverse employment action; and (4) there is evidence that similarly situated individuals outside the protected class received more favorable treatment. *See McDonnell Douglas*, 411 U.S. at 802; *Hill v. Lockheed Martin*

---

*Southcorr L.L.C.*, 324 F.Supp.2d 765, 782-83 (M.D.N.C. 2004). If Plaintiff's federal claims fail as a matter of law, her state-law claim fails too. *See id.*; *McDougal-Wilson v. Goodyear Tire and Rubber Co.*, 427 F.Supp.2d 595, 621 (E.D.N.C. 2006).

*Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). Dr. Cho cannot satisfy requisite elements two and four.

### 1. Not meeting legitimate expectations

Dr. Cho was not meeting legitimate expectations. The record facts demonstrate multiple individuals with various departments/oversight entities lacked confidence in Dr. Cho's ability to perform her role. (*See, e.g.,* declarations of Marion Broome, Marilyn Hockenberry, Barbara Turner, Kimberly Fisher, and Geeta Swamy). Dr. Turner counseled Dr. Cho regarding her poor treatment of staff on multiple occasions. (Turner Decl.¶¶3, 5, Attachments A and B). Dr. Cho failed to inform Duke she had reopened enrollment at UAB. (Fisher Decl.¶7). Dr. Cho failed to follow protocols required for conducting research, such that the IRB found a "pattern of non-compliance." (Swamy Decl.¶5). Dr. Cho can adduce no evidence that she was meeting Duke's legitimate expectations other than her own subjective opinion, which is simply not salient to the analysis. *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (noting Plaintiff's own claim of satisfactory performance insufficient to establish a genuine issue on whether plaintiff met employer's expectations). Dr. Cho cannot establish the second element of her claim.

### 2. No evidence others treated more favorably

In her complaint, Dr. Cho baldly contends that Duke was more critical of Korean-born employees. (Compl. ¶37). Dr. Cho can adduce no evidence to support this allegation. Dr. Cho cannot point to others outside the protected class treated more favorably, and this is fatal to her claim. *See Bryant v. Bell Atl. Maryland, Inc*., 288 F.3d 124, 133 (4th Cir. 2002) (dismissing claim where plaintiff failed to produce comparator evidence). In fact,

there were at the time (and are still) three (3) other School of Nursing research faculty who identify as Korean *without* similar issues: two continue to serve as the PI on their own grants and the third is a successful collaborator on a grant. (Turner Decl.¶20). This includes Dr. Eun Ok Im named in Dr. Cho's complaint and identified in her deposition as a colleague who would support her position. (Compl.¶7). Dr. Im has not experienced discrimination and considers Dr. Hockenberry a friend. (Im Decl.¶¶4,8). Dr. Cho cannot establish the fourth element of her claim.

### 3. No pretext

Even *if* Dr. Cho could establish a *prima facie* case, she cannot establish pretext. At the pretext stage, Dr. Cho's "burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (citation omitted). Dr. Cho's mere disagreement with Duke's business judgments about her performance cannot establish pretext. It is not the Court's role to decide whether the employer's decision was "wise, fair, or even correct, ultimately, so long as it truly was the reason for the [employment decision]." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted).

17

As a researcher at Duke, Dr. Cho had to follow protocols. As an employee of Duke, Dr. Cho was expected to treat her staff with respect and professionalism. There is simply no evidence from which a reasonable factfinder could conclude by a preponderance of the evidence that Duke's explanation for not renewing Dr. Cho's appointment is a mere pretext to mask national origin discrimination.[12]

## C. No Retaliation[13]

To survive summary judgment on her retaliation claim, Dr. Cho must prove that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 543 (4th Cir. 2003).

Dr. Cho alleges these acts were retaliatory: (i) request for the audit (November 2016); (ii) non-renewal of her reappointment (April 2017); (iii) revocation of her PI privileges (May 2017); and (iv) Duke's decision to return the grant to NIH (May 2017). (Cho p.122). However, Dr. Cho did not engage in protected activity within the scope of Title VII until *after* these alleged retaliatory acts. Dr. Cho's own testimony unequivocally demonstrates that she did not know about and national origin discrimination and, thus, **did**

---

[12] To the extent Plaintiff contends she was subjected to a hostile work environment, such a contention must fail. Establishing a hostile work environment requires proof that the workplace is "permeated with discriminatory intimidation, ridicule, and insult … that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). Dr. Cho alleges no derogatory comments about her national origin (Cho pp. 142-144).

[13] To the extent Plaintiff seeks to bring a retaliation claim under NCEEPA, federal courts interpreting North Carolina law have repeatedly made clear that NCEEPA may only be implicated through the tort of wrongful discharge, and that the Act does not give rise to liability for wrongful discharge pursued under a retaliation theory. *See Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000); *See McLean v. Patten Cmtys., Inc.*, 332 F.3d 714, 719 (4th Cir. 2003) ("there is no private right of action under North Carolina law for retaliation under § 143-422.2"). Plaintiff's NCEEPA retaliation claim fails.

Case 1:18-cv-00288-WO-JLW   Document 21   Filed 04/11/19   Page 18 of 25

**not raise national origin discrimination allegations until she filed her EEOC Charge in August 2017**. (Cho p.194).

Duke could not have taken these actions because of protected activity when the protected activity had not yet occurred. *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (holding that the "employer's knowledge that the plaintiff engaged in the protected activity is absolutely necessary to establish the third element of the prima facie case") *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Dr. Cho cannot establish a causal connection and her retaliation claim fails as a matter of law.

## III. Dr. Cho's Defamation Claim Fails

Individual defendant Dr. Hockenberry is entitled to judgment as a matter of law on Dr. Cho's claim of defamation. To recover for defamation, a plaintiff must allege that the defendant caused plaintiff injury by making false, defamatory statements about the plaintiff published to a third person. *Boyce & Isley, PLLC v. Cooper,* 153 N.C. App. 25, 568 S.E.2d 893, 897 (2002) (citation omitted).

In her Complaint, Dr. Cho alleges that "on or about April, 2017 Plaintiff's colleagues, including Dr. Im, were warned by Defendant Hockenberry that Plaintiff would become physically dangerous to them when she becomes angry." (Compl. ¶ 7). Dr. Cho's testimony fleshed this out: Dr. Im's office was next to Dr. Hockenberry's office. (Cho p.134). Dr. Cho contends Dr. Im told her that a hallway door was locked one day, which was unusual. (Cho p.134). Dr. Cho contends that Dr. Im asked unidentified staff "why this door was locked, and staff say, Marilyn Hockenberry ask us to lock all doors because June

19

Cho will come to and maybe harm somebody." (Cho p. 134). This is inadmissible double-hearsay. *See* Fed. R. Evid. 801-804. "At summary judgment, a party can support its motion by showing that an adverse party cannot produce admissible evidence to support a fact." *Adler v. VA. Commonwealth Univ.*, 259 F.Supp.3d 395, 409 (E.D.Va. 2017) (citing Fed. R. Civ. P. 56(c)(1)(B)).

Moreover, Dr. Im does not corroborate Dr. Cho's allegation. (Im Decl.¶5).[14]

Dr. Hockenberry did not make the statement alleged and Dr. Cho can adduce no credible evidence to the contrary. (Hockenberry Decl.¶23).

Other allegedly false and defamatory statements Dr. Cho attributes to Dr. Hockenberry generally include any statement Dr. Cho believes resulted in the audit or the IRB review of her study. (Cho p.138). Dr. Cho does not know of any alleged defamatory statements disseminated outside of Duke or any knowledge that any alleged defamatory statements still being made. (Cho p.160).[15]

Dr. Cho may disagree with the validity of Dr. Hockenberry's escalation of concerns, but in her role Dr. Hockenberry must report any issues that could affect the integrity of the study. (Hockenberry Decl.¶25). Dr. Hockenberry had a qualified privilege to internally escalate perceived issues. *See, e.g. Shult v. Int'l Bus. Machines Corp.*, No. 5:02-cv-357

---

[14] Dr. Im's statement is consistent with the notion that concerns, if any, centered on Dr. Cho's husband, not Dr. Cho. (Im Decl.¶5 ). When Dr. Cho requested to meet with Dr. Tuner in March 2017, Dr. Cho was informed that her husband could not attend the meeting, but he showed up anyway. (Turner Decl.¶11, Attachment C). Dr. Turner asked him to sit in a waiting area, he objected shoving past her into the office and relented only when Dr. Turner said the meeting would be cancelled. (*Id.*). After the meeting, Dr. Cho's husband began verbally attacking and berating Dr. Turner. (*Id.*). Dr. Turner feared that she might be struck. (*Id.*).

[15] For the reasons stated herein, Dr. Cho is not entitled to injunctive relief against Dr. Hockenberry.

20

(BR), 2003 WL 24046341, at *5 (E.D.N.C. Oct. 30, 2003) (recognizing North Carolina courts have interpreted this privilege broadly), *aff'd,* 123 F. App'x 540 (4th Cir. 2004); *R.H. Bouligny, Inc.v. United Steelworkers of Am., AFL-CIO,* 270 N.C. 160, 173, 154 S.E.2d 344, 355 (1967) ("[Q]ualified privilege extends to all communications made bona fide upon any subject matter in which the party communicating has an interest, or in reference to which he has some moral or legal duty to perform."). Therefore, Dr. Cho can prevail only upon proof of actual malice. *R.H. Bouligny, Inc.*, 270 N.C. at 173.

Dr. Hockenberry is entitled to summary judgment where, as here, the communications addressed business activities about subject matter she had to report and where there are no comments (or evidence of any kind) permitting an inference of malice. Further, a mere statement of dissatisfaction with a plaintiff's attitude and work, even if "potentially defamatory" or "imply[ing] some level of impropriety," does not "tend to disgrace and degrade plaintiff or hold [her] up to public hatred, contempt, or ridicule, or cause [her] to be shunned and avoided" so the statement is slanderous *per se*. *Griffin v. Holden*, 180 N.C. App. 129, 135, 636 S.E.2d 298, 303 (2006). Dr. Cho's attempt to morph required internal reporting into a claim for defamation is misguided and fails as a matter of law.

21

## IV. Dr. Cho's Tortious Interference Claim Fails

Dr. Cho's tortious interference claim is similarly fatally flawed. The elements of a tortious interference claim are: (1) A valid contract between plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff. *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (citation omitted).

As the Associate Dean for Research and Clinical Research Unit Director, Dr. Hockenberry was a "non-outsider" (i.e., not a third-party to the contract), and as such enjoys "qualified immunity from liability." *Lenzer v. Flaherty*, 106 N.C. App. 496, 512-13, 418 S.E.2d 276, 286 (1992). "The qualified privilege of a non-outsider is lost [only] if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interest in the contract [allegedly] interfered with." *Id.* at 513. Dr. Cho must prove that Dr. Hockenberry "acted with malice and for a reason not reasonably related to the protection of a legitimate business interest." *Market America, Inc. v. Christman-Orth*, 135 N.C. App. 143, 158, 520 S.E.2d 570, 581 (1999). This she cannot do.

Dr. Hockenberry acted under the obligations of her role seeking to ensure regulatory compliance and integrity. This point is not in dispute as Dr. Cho admits that requesting an audit falls within the scope of Dr. Hockenberry's role as does reporting of perceived security issues or protocol deviations. (Cho pp.78, 183-84). There is no record evidence

22

Dr. Hockenberry pursued an illegitimate business interest or was motivated by a malicious wish to injure Dr. Cho.

Dr. Cho's tortious interference claim fails as a matter of law.

## **CONCLUSION**

Even when viewing the evidence in the light most favorable to Dr. Cho, no reasonable jury could conclude that Duke discriminated or retaliated against her because of her national origin, nor could they conclude that Dr. Hockenberry defamed or tortiously interfered with Dr. Cho's employment. Summary judgment should be granted on all counts of Plaintiff's Complaint and costs awarded to Defendants.

Respectfully submitted this 11th day of April, 2019.


OGLETREE, DEAKINS, NASH,
  SMOAK & STEWART, P.C.

**/s/ Kimberly J. Lehman**
Robert A. Sar, N.C. Bar No. 22306
Kimberly J. Lehman, N.C. Bar No. 43001
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
E-mail: robert.sar@ogletreedeakins.com
E-mail: kimberly.lehman@ogletreedeakins.com
*Attorneys for Defendant Duke University and Marilyn Hockenberry*

23

## CERTIFICATE OF WORD COUNT

I certify that Defendant Duke University's Memorandum in Support of Summary Judgment contains 5981 words as counted by the word count feature of Microsoft Word 2010, and thereby complies with Local Rule 7.3(d)(1).

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

**/s/ Kimberly J. Lehman**
Robert A. Sar, N.C. Bar No. 22306
Kimberly J. Lehman, N.C. Bar No. 43001
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
E-mail: robert.sar@ogletreedeakins.com
E-mail: kimberly.lehman@ogletreedeakins.com
*Attorneys for Defendant Duke University and*
*Marilyn Hockenberry*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing **Defendants' Memorandum in Support of Summary Judgment** has been electronically filed with the Clerk of Court using the CM/ECF system which will notify the following individual:

Nancy P. Quinn
315 Spring Garden Street, Suite 1D
Greensboro, NC 27401
npquinn@triadbiz.rr.com
*Attorney for Plaintiff*

This the 11th day of April, 2019.

OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.

**/s/ Kimberly J. Lehman**
Robert A. Sar, N.C. Bar No. 22306
Kimberly J. Lehman, N.C. Bar No. 43001
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
4208 Six Forks Road, Suite 1100
Raleigh, NC 27609
Telephone: 919.787.9700
Facsimile: 919.783.9412
E-mail: robert.sar@ogletreedeakins.com
E-mail: kimberly.lehman@ogletreedeakins.com
*Attorneys for Defendant Duke University*
*And Marilyn Hockenberry*

38123085.1