```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

```
JUNE CHO,                    )
                             )
              Plaintiff,     )
                             )
       v.                    )        1:18CV288
                             )
DUKE UNIVERSITY and          )
MARILYN HOCKENBERRY,         )
                             )
              Defendants.    )
```

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff June Cho brings several claims against Defendants Duke University ("Duke") and Marilyn Hockenberry ("Hockenberry"), including defamation, tortious interference with contract, and national origin discrimination in violation of federal and state law. (Doc. 7.) Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56. (Doc. 20.) Plaintiff has responded, (Docs. 25, 26), and Defendants have filed a reply, (Doc. 27). This court finds that Plaintiff has failed to raise any genuine issues of material fact regarding whether Defendant Duke discriminated against Plaintiff based on national origin or whether Defendant Hockenberry tortiously interfered with Plaintiff's contract or defamed her. Defendants' motion for summary judgment, therefore, will be granted.

# I. FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Plaintiff was born in South Korea and is now a United States citizen. (Notice of Filing (Doc. 34) Ex. 1, Deposition of June Cho ("Cho Dep.") (Doc. 34-1) at 10.)[1] She received her PhD from the University of North Carolina at Chapel Hill. (Id. at 15.)

Duke hired Plaintiff as an associate professor without tenure for the academic year beginning July 1, 2015. (Motion of Defendants Duke University and Marilyn Hockenberry for Summary Judgment ("Defs.' Mot.") (Doc. 20) Ex. 2, Offer Letter (Doc. 20-2) at 2.) Prior to working at Duke, Plaintiff worked as a faculty researcher at the University of Alabama, Birmingham ("UAB"). (Cho Dep. (Doc. 34-1) at 15–16.) During her time at UAB, Plaintiff received an RO1 research grant from the National Institutes of Health ("NIH"). (Id. at 18–19.) This grant helped fund Plaintiff's research, studying testosterone and cortisol levels in infants. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. (Pl.'s Resp. Mem. (Doc. 26) Ex. 3, Equal Employment Opportunity Commission Charge of Discrimination ("EEOC Charge") (Doc. 26-3) at 3.) The RO1 grant followed Plaintiff to Duke. (Cho Dep. (Doc. 34-1) at 23–25.)

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

## A.   Duke University Research Oversight Structure

Several Duke employees supervised Plaintiff and her work. When Plaintiff arrived at Duke in July 2015, Plaintiff reported to the Associate Dean for Research for the School of Nursing. (Id. at 29.) Diane Holditch-Davis was the Associate Dean for Research until December 2015. (Id. at 20, 28-29.) Defendant Hockenberry took over as the Duke University School of Nursing Associate Dean for Research starting in September 2015 until August 2018, after Plaintiff left Duke. (Id. at 29, 122; Defs.' Mot. (Doc. 20) Ex. 3, Declaration of Marilyn Hockenberry ("Hockenberry Decl.") (Doc. 20-3) ¶ 5.) She did not directly supervise Plaintiff. (Hockenberry Decl. (Doc. 20-3) ¶ 6.)

Defendant Hockenberry also served as the Clinical Research Unit Director for Duke University School of Nursing. (Id. ¶ 5.) As the Clinical Research Unit Director, Defendant Hockenberry supervised Research Practice Managers, who are part of Clinical Research Units, which "are responsible for ensuring research integrity and compliance with all state, federal, and institutional regulations and policies." (Id. ¶ 6.) She directly supervised Phyllis Kennel, the Research Practice Manager supervising Plaintiff's study. (Id. ¶ 7.)

Within this structure, "[r]esearch study staff report directly to the Research Practice Managers, not the Principal Investigator or 'PI.'" (Id. ¶ 6.) "This reporting structure is

intended to avoid concerns of undue influence by a PI, which may be more likely to occur in a centralized power structure." (Id.) Plaintiff was the PI for her research project. (Id. ¶ 8.)

Duke also has an Institutional Review Board ("IRB"). (Id. ¶¶ 2–3.) The IRB's "mission is to ensure the protection of human research subjects." (Id. ¶ 3.) The IRB must review and approve all research study protocols, and any changes to protocols "must also be submitted and approved prior to implementation."[2] (Id.)

Several others were also involved in supervising and assisting Plaintiff's research. Barbara Turner, Chair of the Health of Women, Children, and Families Division of the Duke University School of Nursing, served as Plaintiff's direct supervisor. (Defendants' Reply in Support of Summary Judgment ("Defs.' Reply") (Doc. 27) Ex. 1, Second Declaration of Barbara Turner (Doc. 27-1) ¶ 2.) As Plaintiff's supervisor, Turner "conducted [Plaintiff's] annual performance evaluations." (Id. ¶ 3.) Kimberley Fisher is the Director of the Neonatal-Perinatal Research Unit ("NPRU") at Duke. (Defs.' Mot. (Doc. 20) Ex. 6, Declaration of Kimberley Fisher ("Fisher Decl.") (Doc. 20-6) ¶ 2.) In this role, she worked with both the School of Nursing and the School of Medicine. (Id.) Though not an official part of her role, Fisher stepped in as the Study Coordinator for

---

[2] IRBs are common and exist at other research universities. (Hockenberry Decl. (Doc. 20-3) ¶ 3.)

Plaintiff's research when the prior Study Coordinator left Duke. (Id. ¶¶ 4-5.) Marion Broome serves as the Dean for Duke University School of Nursing. (Defs.' Mot. (Doc. 20) Ex. 4, Declaration of Marion Broome ("Broome Decl.") (Doc. 20-4) ¶ 2.)[3] Broome was involved in the decision to hire Plaintiff. (Id. ¶ 3.) Phyllis Kennel served as the Director of Research Operations and as a Research Practice Manager for the Duke University School of Nursing Clinical Research Unit from May 2012 to February 2017. (Defs.' Mot. (Doc. 20) Ex. 8, Declaration of Phyllis Kennel ("Kennel Decl.") (Doc. 20-8) ¶ 2.) In her role as Research Practice Manager, she "provided assistance and supervisory oversight to Dr. Cho's research staff." (Id. ¶ 4.) Plaintiff's staff therefore reported directly to Kennel. (Id.; Cho Dep. (Doc. 34-1) at 31.) Kennel assisted Hockenberry with the research supervision. (Cho Dep. (Doc. 34-1) at 30–31.) When Kennel stepped down as a Research Practice Manager for Plaintiff's study in February 2017, Heather Adams took over Kennel's role. (Hockenberry Decl. (Doc. 20-3) ¶ 17[4]; Defs.' Mem. (Doc. 20) at 11.)

---

[3] Broome also serves as the Ruby F. Wilson Professor of Nursing for Duke University School of Nursing and the Vice Chancellor for Nursing Affairs at Duke. (Broome Decl. (Doc. 20-4) ¶ 2.) She has held these positions since 2014. (Id.)

[4] The date reflected in paragraph 17 of Hockenberry's declaration should be March 22, 2017, as opposed to March 22, 2016. (Hockenberry Decl. (Doc. 20-3) ¶ 17.)

## B. __Issues with Protocol__

As noted earlier, when Duke hired Plaintiff, she brought the R01 grant on infants with her to Duke. (Cho Dep. (Doc. 34-1) at 23–25.) Once Plaintiff finished transferring the study from UAB to Duke, Plaintiff experienced several issues with the Duke research protocol requirements. First, when Plaintiff went over her research protocol with Fisher, Fisher expressed concern over some of Plaintiff's protocols, as they "contradicted the standard of care practices for Duke's newborn intensive care unit and special infant care unit." (Fisher Decl. (Doc. 20-6) ¶ 3.)[5]

On another occasion in March 2017, Heather Adams, then an Assistant Research Practice Manager, went to Defendant Hockenberry with a complaint about Plaintiff. (Hockenberry Decl. (Doc. 20-3) ¶ 17.) At that time, Adams had taken over for Kennel as the CRU point-person for Plaintiff's research staff. (Id.) Adams told Defendant Hockenberry that "she walked into [Plaintiff's] office and saw [Plaintiff] looking at study information on a computer with a PhD student [Plaintiff]

---

[5] For instance, Kimberley Fisher explained that "premature infants are fragile, and it may not be feasible to obtain multiple saliva samples at 15 minute intervals as stated in the protocol," and that "because of space, some infants who are stable may be moved to another facility prior to reaching 40 weeks when the final pre-discharge sample was to be collected under [Plaintiff's] protocol." (Fisher Decl. (Doc. 20-6) ¶ 3.)

intended to hire." (Id.) The PhD student had not yet been approved to work on the study, however. (Id.) Further, Plaintiff had apparently requested that IT give this student access to folders containing secure electronic data. (Id.) Defendant Hockenberry entered the report into the IRB's electronic reporting system. (Id.) Plaintiff refutes that she showed the student the data. (Cho Dep. (Doc. 34-1) at 126.) Plaintiff emailed Adams asking her whether she had really seen Plaintiff showing the student data, and that "[i]f you do not answer within one week, I assume that it was not true." (Id. at 128–29.) Adams apparently responded that she did not make the report. (Id. at 129.)

Further, Defendant Hockenberry allegedly accused Plaintiff of using a device in her study without permission, (id. at 130), and of sending data to outside analysts without a proper data transfer agreement in place, (id. at 130–31). She also allegedly accused Plaintiff of not properly compensating a research staff member and failing to respond to emails. (Id. at 131.) Defendant Hockenberry also noted that Plaintiff attempted to use unauthorized training materials for her team. (Hockenberry Decl. (Doc. 20-3) ¶ 12.)

C.    **Reopening of Study Enrollment at UAB**

As a second issue with the protocol requirements, Duke insisted that the entire study take place at Duke, with the

- 7 -

exception of the existing research subjects at UAB. (Cho Dep. (Doc. 34-1) at 23–24.) Plaintiff, however, became frustrated at the low numbers of new subjects enrolling in her study, and in the fall of 2016, reopened subject recruitment for the study at UAB without the approval of the Duke IRB. (Id. at 52–53, 64–65.) This violated Duke's research protocol. (Id. at 53; Broome Decl. (Doc. 20-4) ¶ 4.) Plaintiff contends that she received verbal permission from Turner to reopen enrollment at UAB. (Cho Dep. (Doc. 34-1) at 54.)

Hockenberry, Fisher, and Kennel found out in November 2016 that Plaintiff had re-opened enrollment at UAB. (Hockenberry Decl. (Doc. 20-3) ¶ 12; Fisher Decl. (Doc. 20-6) ¶ 7; Kennel Decl. (Doc. 20-8) ¶ 12.) Fisher consulted with the chief of Neonatology and the medical director for research concerning this break from protocol. (Fisher Decl. (Doc. 20-6) ¶ 8.) They decided that the NPRU would no longer work with Plaintiff; "this decision meant that recruitment at Duke for this study would no longer be allowed and [Plaintiff] would need to find another site." (Id.) Fisher informed the School of Nursing of this decision in December 2016. (Id.)

### D. **Personnel Issues**

In the months preceding the re-opening of the UAB enrollment, Plaintiff also seemed to have trouble with members of her staff. Plaintiff discouraged her Study Coordinator from

attending medical school at East Carolina University, because it is not "prestigious." (Kennel Decl. (Doc. 20-8) ¶ 7.) Plaintiff also got upset when her data technician needed to be admitted to the hospital unexpectedly in advance of a scheduled surgery, which created a one-week gap in coverage. (Id. ¶ 9.) Plaintiff "believed it was [Kennel's] job to fill in," even though it was not Kennel's job. (Id.; id. at 7–8.)

In May 2016, Plaintiff also requested that the Duke statisticians assigned to her project be removed. (Cho Dep. (Doc. 34-1) at 70–71.) She "had become upset when the statisticians had not found significant findings and wanted them to rerun the data to find significance." (Turner Decl. (Doc. 20-5) ¶ 4.) She instead wanted to work with an outside consultant at a Texas university, with whom she had worked on prior studies. (Cho Dep. (Doc. 34-1) at 68–71.) Plaintiff states that she understood she would need a data transfer agreement in place in order to work with this outside consultant. (Id. at 72.)

### E. Defendant Hockenberry's Performance Review, the Office of Audit, Risk and Compliance's Audit, and the IRB's Review

After learning of these various issues, Defendant Hockenberry consulted with the Vice Dean for Clinical Research at Duke, who suggested that Defendant Hockenberry reach out to Duke's Office of Audit, Risk and Compliance to conduct an audit

of the study. Defendant Hockenberry requested an audit in
mid-November 2016. (Hockenberry Decl. (Doc. 20-3) ¶ 13.)
Defendant Hockenberry also met with Turner, Kennel, Fisher, and
Plaintiff in November 2016 to discuss the enrollment re-opening
at UAB. (Cho Dep. (Doc. 34-1) at 75.) During that meeting,
Defendant Hockenberry told those gathered that she would be
inviting an audit into Plaintiff's research. (Id. at 80.)

After Defendant Hockenberry requested an audit, enrollment
for Plaintiff's study was put on hold at both Duke and UAB.
(Hockenberry Decl. (Doc. 20-3) ¶ 13.) The Office of Audit, Risk
and Compliance finished its audit of Plaintiff's study in
February 2017. (Turner Decl. (Doc. 20-5) ¶ 10.) The audit
apparently noted deviations from the approved IRB protocol,
(id.), but the audit apparently did not find Plaintiff's conduct
warranted further action or discipline, (Cho Dep. (Doc. 34-1) at
82). Defendant Hockenberry was upset by this result. (Id. at
83.)

Defendant Hockenberry reported the audit and the other
concerns about Plaintiff's study to the Duke IRB in December
2016. (Turner Decl. (Doc. 20-5) ¶ 8; Hockenberry Decl. (Doc.
20-3) at 13.) The Duke IRB conducted a full board review of
Plaintiff's study, separate from the audit. (Hockenberry Decl.

(Doc. 20-3) ¶¶ 15–16.)[6] "[T]he board unanimously voted to recommend that based on a pattern of non-compliance, [Plaintiff's] PI privileges be revoked." (Defs.' Mot. (Doc. 20) Ex. 7, Declaration of Geeta Swamy ("Swamy Decl.") (Doc. 20-7) ¶ 5.) The Duke IRB submitted its recommendation to the Dean of the School of Medicine, "who is an Institutional Officer tasked with making a determination[] based on IRB recommendations." (Id. ¶ 6.) The Dean of the School of Medicine agreed and "informed [Plaintiff] that her PI privileges were revoked" in May 2017. (Id.)

Defendant Hockenberry, in late March 2017, went over Plaintiff's annual performance review with her. In that review, Defendant Hockenberry told Plaintiff that Plaintiff had difficult relationships with people and that Plaintiff had violated protocols in her research. (Cho Dep. (Doc. 34-1) at 127.)

**F.    Plaintiff's Meeting with Turner and Statements Concerning Plaintiff and Her Husband**

In March 8, 2017, Plaintiff met with Turner to discuss the audit and Defendant Hockenberry. (Id. at 87–88; Turner Decl. (Doc. 20-5) ¶ 11.) Plaintiff brought her husband with her to

---

[6] While Defendant Hockenberry was one of the IRB chairs during the IRB's review of Plaintiff's study, she did not participate in the full board review, nor did she play a role in the board's recommendation. (Defs.' Mot. (Doc. 20) Ex. 7, Declaration of Geeta Swamy ("Swamy Decl.") (Doc. 20-7) ¶ 7.)

this meeting for moral support. (Cho Dep. (Doc. 34-1) at 117.)
Turner did not allow Plaintiff's husband into the meeting;
instead, Turner contends that she "asked him to sit in a waiting
area, he objected and shoved past [her] into [her] office."
(Turner Decl. (Doc. 20-5) ¶ 11.) Turner further says that he
relented once Turner threatened to cancel the meeting. (Id.)
However, Turner states that when she and Plaintiff walked out
after their meeting, "her husband verbally attacked [Turner] and
berated [Turner] such that [Turner] was fearful that [she] might
be struck." (Id.)[7]

   Plaintiff asserts that sometime after this meeting,
Defendant Hockenberry asked her staff to lock all the doors on
the first floor because Plaintiff could become physically
dangerous. (Cho Dep. (Doc. 34-1) at 133-34.) Plaintiff says that
Dr. Eun Ok Im, a faculty member at the time, whose office was
next to Defendant Hockenberry's, attempted to get into her
office, but her door was locked. (Id.) Plaintiff contends that
Dr. Im told her that when Dr. Im asked why the door was locked,
"staff say, Marilyn Hockenberry ask us to lock all doors because
[Plaintiff] will come to and maybe harm someone." (Id. at 134.)

---

[7] Turner's declaration includes an attachment of her
contemporaneous notes from that day which go into more detail.
(Turner Decl. (Doc. 20-5) at 9–10.)

In her declaration, Dr. Im states that she "asked the staff member why the doors were locked. The staff member said that it was a safety precaution because of concerns related to Dr. Cho's husband," but that she could "not recall the specific words." (Defs.' Mot. (Doc. 20) Ex. 9, Declaration of Eun Ok Im ("Im Decl.") (Doc. 20-9) ¶ 5.)

Defendant Hockenberry refutes that she made this statement or any similar statements. (Hockenberry Decl. (Doc. 20-3) ¶ 23.) She notes that she "was made aware that Dr. Turner had an interaction with [Plaintiff's] husband that made her feel uncomfortable and unsafe." (Id.)

### G. Decision to Not Renew Plaintiff's Appointment and Early Termination of Research Grant

Starting in January 2017, Broome, concerned about the audit, the IRB review, and that the NPRU would no longer support Plaintiff's study, consulted with other members of leadership and made the decision not to renew Plaintiff's Associate Professor appointment. (Broome Decl. (Doc. 20-4) ¶ 4.) Broome signed the letter containing this decision on April 6, 2017. (Id. ¶ 5.) Turner informed Plaintiff of this decision on April 12, 2017. (Id.) Duke offered Plaintiff a $27,000 severance to leave within three months. (Cho Dep. (Doc. 34-1) at 122.) Plaintiff declined and was paid through June 30, 2018. (Id.)

In May 2017, after the IRB recommended that Plaintiff's status as PI on her project be revoked, Broome consulted with department leadership and determined that "the School of Nursing should return the grant to the National Institutes of Health."[8] (Broome Decl. (Doc. 20-4) ¶¶ 6–7.)

### H. Plaintiff's Grievance Report

On March 8, 2017, Plaintiff met with Turner to discuss the audit and Defendant Hockenberry. (Cho Dep. (Doc. 34-1) at 87–88; Turner Decl. (Doc. 20-5) ¶ 11.) Plaintiff informed Turner that she wanted to file a complaint of some kind. (Cho Dep. (Doc. 34-1) at 88.) Turner suggested Plaintiff go see the Duke Ombudsman. (Id. at 99.) On April 3, 2017, Plaintiff delivered her report to the Ombudsman, who delivered the report to the Grievance Committee. (Id. at 103; EEOC Charge (Doc. 26-3) at 3.) Plaintiff's report discussed Defendant Hockenberry "micromanaging" Plaintiff's research, and general "harassment." (Cho Dep. (Doc. 34-1) at 102; Hockenberry Decl. (Doc. 20-3) ¶ 21.) Plaintiff also asked for the resignations of Defendant Hockenberry and Fisher. (Cho Dep. (Doc. 34-1) at 103.)

In June 2017, Defendant Hockenberry, Broome, Turner, Fisher, and Kennel attended the Faculty Hearing Committee hearing concerning Plaintiff's grievance. (Hockenberry Decl.

---

[8] Defendant Hockenberry was not involved in these discussions. (Broome Decl. (Doc. 20-4) ¶ 7.)

(Doc. 20-3) ¶ 21.) The Committee issued its unanimous decision in July 2017 finding that Plaintiff was not the subject of impermissible harassment based on national origin or any other protected category or academic due process violations. (Id.; Turner Decl. (Doc. 20-5) ¶ 16; Kennel Decl. (Doc. 20-8) ¶ 14.) The Committee's decision apparently "noted that Dr. Cho utilized the term 'harassment' to refer to alleged 'general mistreatment by administration that she found detrimental to her research.'" (Turner Decl. (Doc. 20-5) ¶ 16.)

## I. Equal Employment Opportunity Commission ("EEOC") Charge

In August 2017, Plaintiff filed a Charge of Discrimination with the EEOC. (EEOC Charge (Doc. 26-3) at 2.) Plaintiff's EEOC Charge discusses Defendant Hockenberry's involvement in Plaintiff's research, which Plaintiff alleges barred her from being able to move forward with her research. (Id. at 3.) Plaintiff further alleges that Defendant Hockenberry discriminated against her based on national origin. (Id.) She then states that she filed a grievance report against Defendant Hockenberry on April 3, 2017, and that Plaintiff experienced three instances of retaliation for filing the grievance report: (1) the April 12, 2017 notice to Plaintiff that her appointment

would not be renewed after June 2018;[9] (2) the May 2017 adoption of IRB's recommendation that Plaintiff's PI status be removed; and, (3) the May 2017 termination of her RO1 grant. (Id. at 5-7.) Plaintiff noted that she did not know about the EEOC or national origin discrimination until August 2017. (Id.; Cho Dep. (Doc. 34-1) at 186.)

### J.    **Procedural History**

On December 12, 2017, the EEOC issued Plaintiff a Right-to-Sue letter and informed Plaintiff that she had ninety days to file suit. (Complaint ("Compl.") (Doc. 7) ¶ 41.) Assuming that Plaintiff received the Right-to-Sue letter on December 12, 2017, Plaintiff had until March 14, 2018, to file suit. (See id.) Plaintiff timely filed this suit on March 9, 2018, in Guilford County Superior Court. (Id.) Shortly thereafter, Defendants removed this action to this court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, asserting that Plaintiff's complaint involves federal questions and that this court can exercise supplemental jurisdiction over the remaining state claims pursuant to 28 U.S.C. § 1367(a). (See Petition for Removal (Doc. 1) at 1-4.)

On April 11, 2019, Defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Defs.' Mot. (Doc. 20).) Defendants filed a brief in support of this motion,

---

[9] The notice was dated April 6, 2017. (EEOC Charge (Doc. 26-3) at 5.)

(Defs.' Memorandum in Support of Summary Judgment ("Defs.' Br.")
(Doc. 21)), to which Plaintiff responded, (Pl.'s Response in
Opposition to Defendant's Motion for Summary Judgment (Doc.
25)); Pl.'s Memorandum in Opposition to Defendants' Motion for
Summary Judgment ("Pl.'s Br.") (Doc. 26)), and Defendants
replied, (Defs.' Reply in Support of Summary Judgment ("Defs.'
Reply") (Doc. 27)).

Defendants argue that there are no genuine issues of
material fact, and that Defendants are entitled to judgment as a
matter of law. (Defs.' Mot. (Doc. 20) at 1.) In particular,
Defendants argue that Plaintiff "can present no evidence of
national origin discrimination and Dr. Cho's own testimony
demonstrates that she did not complain of national origin
discrimination until after the acts she contends were
retaliatory." (Defs.' Br. (Doc. 21) at 2.) Defendants also argue
that Plaintiff's defamation claim against Defendant Hockenberry
is "based on incorrect assumptions and inadmissible double-
hearsay" and that "[t]o the extent Dr. Hockenberry reported
concerns about Dr. Cho's work and performance, she was obligated
to do so in her role as Clinical Research Unit Director and is
entitled to a qualified privilege." (Id.) Finally, Defendants
argue that Plaintiff's tortious interference claim fails because
Defendant Hockenberry is a "non-outsider to the alleged

contract," and that Plaintiff fails to prove actual malice as is required. (Id.)

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). This court must look to substantive law to determine which facts are material — only those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).

This court therefore must determine whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718–19 (4th Cir. 2003).

III. **ANALYSIS**

Plaintiff claims that Defendant Hockenberry defamed her and seeks an injunction against any further "derogatory or defamatory comments." (Compl. (Doc. 7) ¶ 15.) Plaintiff further claims that Defendant Hockenberry tortiously interfered with the employment relationship between Plaintiff and her employer, Duke. (Id. ¶ 26.) Finally, Plaintiff claims that Duke, by and through its authorized agents, discriminated against her based on national origin in violation of Title VII, as well as "the public policy of the State of North Carolina" and North Carolina General Statute § 143-422.1 et seq. (Id. ¶¶ 40, 42.) The court will address each claim in turn.

A. **Defamation**

Plaintiff's common-law defamation claim against Defendant Hockenberry includes slander per se. (Compl. (Doc. 7) ¶ 9.) She also seeks an injunction against Defendant Hockenberry to prevent her from making "any derogatory or defamatory comments regarding Plaintiff." (Id. ¶¶ 14-17.)

To succeed on a defamation claim in North Carolina, a plaintiff must allege that (1) the defendant caused injury to the plaintiff; (2) by making false, defamatory statements; (3) of or concerning the plaintiff; and (4) which were published to a third person. Boyce & Isley, PLLC v. Cooper, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002). In North Carolina, slander is

included under defamation. "Slander per se is 'an oral communication to a third party which amounts to . . . an allegation that impeaches the plaintiff in his trade, business, or profession.'" Id. at 29–30, 568 S.E.2d at 898 (quoting Phillips v. Winston-Salem/Forsyth Cty. Bd. of Educ., 117 N.C. App. 274, 277, 450 S.E.2d 753, 756 (1994)). "A prima facie presumption of malice and a conclusive presumption of legal injury and damage arises when a false statement falling into one of these categories is spoken." Barker v. Kimberly-Clark Corp., 136 N.C. App. 455, 460, 524 S.E.2d 821, 824–25 (2000).

Plaintiff submits evidence that Defendant Hockenberry made several defamatory statements: that Plaintiff was prone to violence, (Cho Dep. (Doc. 34-1) at 135–36); that, during a performance review, Defendant Hockenberry said Plaintiff was bad at maintaining professional relationships and had violated IRB protocol, (id. at 127); statements concerning protocol violations that led to the audit and IRB review, (id. at 128, 130–33, 138); and statements made to Plaintiff's colleagues about Plaintiff being a "very bad person and very difficult to . . . have a relationship with," (id. at 139), a "really wrongful researcher," (id. at 137), and that being friends with Plaintiff would not help them, (id. at 141–42).

Defendants claim that the alleged defamatory statement about Plaintiff being prone to violence is inadmissible double

hearsay and therefore cannot serve to overcome Defendants'
motion for summary judgment. (Defs.' Br. (Doc. 21) at 20.)
Defendants further claim that Defendant Hockenberry's qualified
privilege protects her other allegedly slanderous statements
relating to the audit or IRB review of Plaintiff's study. (Id.
at 20-21.) Finally, Defendants argue that the statement that
being friends with Plaintiff would be bad for her colleague's
career is inadmissible double hearsay. (Defs.' Supplemental
Brief (Doc. 37) at 6-7.) The court agrees with Defendants.

    With regard to the other two statements allegedly made to
Plaintiff's colleagues, concerning Plaintiff being bad at
relationships and being a bad researcher, neither Plaintiff in
her complaint nor Defendants in their motion for summary
judgment address these statements specifically. Plaintiff's
complaint is vague as to specific statements; Plaintiff only
states that Defendant Hockenberry "in the presence of diverse
persons and in a public manner, charged and accused Plaintiff of
. . . incompetence and mismanagement in the performance of her
duties . . . ." (Compl. (Doc. 7) ¶ 6.) Plaintiff discusses these
two statements in her deposition. (Cho Dep. (Doc. 34-1) at 137,
139.) The court therefore will address these statements, as they
could potentially fall into the category of defamatory
statements about which Plaintiff complains.

### 1.  Statements about Plaintiff Being Violent

Plaintiff alleges that Defendant Hockenberry defamed her by allegedly "charg[ing] and accus[ing] Plaintiff of physically dangerous behavior as well as incompetence and mismanagement in the performance of her duties with Duke University." (Compl. (Doc. 7) ¶ 6.) More specifically, Plaintiff, in her deposition, asserts that Dr. Im, upon finding that her office door was locked, asked the staff why the door was locked. (Cho Dep. (Doc. 34-1) at 134.) Plaintiff states that the staff told Dr. Im that "Marilyn Hockenberry ask us to lock all doors because June Cho will come to and maybe harm someone." (Id.)

Any of Plaintiff's own testimony that Dr. Im told her that Defendant Hockenberry had told staff, who told Dr. Im, things about Plaintiff is plainly inadmissible hearsay. Materials submitted at summary judgment must be presented in a form admissible in evidence. Fed. R. Civ. P. 56(c)(1)(B), (c)(2), (c)(4). "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." Md. Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991). When there are multiple levels of hearsay, each level must independently qualify for an exception to the rule against hearsay. Fed. R. Evid. 805.

Plaintiff, in her complaint, asserts that "Plaintiff's colleagues, including Dr. Im, were warned by Defendant

Hockenberry that Plaintiff would become physically dangerous to them when she becomes angry." (Compl. (Doc. 7) ¶ 7.) Dr. Im, however, asserts that she "do[es] not recall that Dr. Hockenberry made this statement to [her]," only that "[she] asked the staff member why the doors were locked. The staff member said it was a safety precaution because of concerns related to [Plaintiff's] husband." (Im Decl. (Doc. 20-9) ¶ 5.)

Dr. Im's declaration that the staff told her the doors were locked because of concerns about Plaintiff's husband is therefore inadmissible double hearsay. Here, the first level of hearsay is what Defendant Hockenberry allegedly told staff. This statement might be admissible under the party-opponent exception to the hearsay prohibition. Fed. R. Evid. 801(d)(2)(A). However, Defendant Hockenberry and Dr. Im deny the statement. (Hockenberry Decl. (Doc. 20-3) ¶ 23; Im Decl. (Doc. 20-9) ¶ 5.) Plaintiff has not identified a staff member who can testify to the statement; therefore, the second level of hearsay is what the staff said to Dr. Im. There is no applicable hearsay exception for the staff's statement.[10]

Because the only evidence submitted on this statement is inadmissible double hearsay, Plaintiff does not create a genuine

---

[10] While the staff's statement to Dr. Im could arguably come in under the party-opponent's employee hearsay exception under Fed. R. Evid. 801(d)(2)(D), this exception cannot apply because Plaintiff is not suing Duke for defamation.

issue of material fact as Plaintiff has failed to present evidence in admissible form, nor has Plaintiff shown how this evidence might be admissible at trial.

## 2. Statements During Annual Performance Review and Statements Leading to the Audit and IRB Review

Plaintiff also submits evidence that Defendant Hockenberry's statements that led to the audit and the IRB review of Plaintiff's projects, as well as her statements to Plaintiff during her annual performance review, were defamatory.

Plaintiff states that "Marilyn Hockenberry said I had very wrong relationship, very difficult relationship with others, and I made some violations on my research . . . Hockenberry was really concern about my research activity." (Cho Dep. (Doc. 34-1) at 127.) These statements were allegedly made in connection with or during Plaintiff's annual performance review. (Id.)

These statements, made to Plaintiff alone during a performance review, are not defamatory under the circumstances, however. To be defamatory, the statements must be "published to a third person." Boyce & Isley, PLLC, 153 N.C. App. at 29, 568 S.E.2d at 898. Because Plaintiff submits no evidence that Defendant Hockenberry included these comments in any sort of official report read by someone else or made these statements to

anyone other than Plaintiff, the court finds these statements are not defamatory as a matter of law.

Further, Plaintiff alleges that Defendant Hockenberry's reports to the IRB and the Office of Audit, Risk and Compliance were defamatory. These include Defendant Hockenberry's reports that Plaintiff allowed an unauthorized PhD student to access study data, (Cho Dep. (Doc. 34-1) at 125-26), reporting the re-opening of enrollment at UAB without permission, (id. at 130), that Plaintiff was using a device in her study without permission, (id.), and that Plaintiff was sending data to outside analysts without a proper data transfer agreement, (id. at 130-31).

Defendant Hockenberry has a qualified privilege to discuss and address perceived issues with those individuals whom she supervises or other Duke supervisors.

A statement which would otherwise qualify as slander per se may be protected by privilege.

> A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

Stewart v. Nation-Wide Check Corp., 279 N.C. 278, 285, 182 S.E.2d 410, 415 (1971). "Where the affirmative defense of

privilege is alleged, the burden is on the defendant to establish facts sufficient to show that the publication of the alleged defamation was made on a privileged occasion." Shuping v. Barber, 89 N.C. App. 242, 245, 365 S.E.2d 712, 714 (1988). "The existence of the privilege creates a presumption that the communication was made in good faith and without malice." Phillips, 117 N.C. App. at 278, 450 S.E.2d at 756. "The burden then falls upon the claimant to show either actual malice on the part of the declarant or excessive publication." Market Am., Inc. v. Christman-Orth, 135 N.C. App. 143, 150, 520 S.E.2d 570, 576 (1999).

Actual malice may be demonstrated by "evidence of ill-will or personal hostility on the part of the declarant . . . or by a showing that the declarant published the defamatory statement with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity." Clark v. Brown, 99 N.C. App. 255, 263, 393 S.E.2d 134, 138 (1990). Summary judgment is "most appropriate . . . where plaintiff, who, assuming the burden of production to negate defendant's presumption of good faith with evidence of actual malice, sets forth no specific fact showing an issue as to defendant's motive, but rests upon bare allegation and suspicion." Dobson v. Harris, 352 N.C. 77, 87, 530 S.E.2d 829, 837 (2000).

Defendant Hockenberry has presented facts which are not disputed and which establish that the elements of qualified privilege are all present here. First, Defendant Hockenberry, in her role as Associate Dean for Research and Clinical Research Unit Director, had a duty "to report the audit and related concerns about Dr. Cho's study to the Duke IRB." (Hockenberry Decl. (Doc. 20-3) ¶ 15.) Indeed, Plaintiff even admits that it was "reasonable for [Defendant Hockenberry] to raise concerns about work performance or perceived security issues or perceived protocol deviations," that it was "[a]bsolutely her job, and that's her good reason to give hard time to [Plaintiff]," and that "part of her role was to protect the university." (Cho Dep. (Doc. 34-1 at 183-84.) Plaintiff also admits that it was within the scope of Defendant Hockenberry's role to request an audit. (Id. at 78.) Defendant Hockenberry was therefore obligated to report Adams' report that she had witnessed Plaintiff looking at study information with a PhD student who had not yet been officially approved on the study; she was also obligated to report Plaintiff's re-opening of recruitment at UAB. (Hockenberry Decl. (Doc. 20-3) ¶¶ 10, 12, 17.)

The second requirement, that the statements be made to a person having a corresponding interest or duty, is also satisfied here for all the statements. The Duke IRB and Office of Audit, Risk and Compliance both had a corresponding duty or

interest in maintaining the integrity of research done at Duke
or investigating any protocol deviations. (See id. ¶ 16; Swamy
Decl. (Doc. 20-7) ¶ 3.)

The third requirement, that the statements be made on a
"privileged" or "proper" occasion, is satisfied here as well.
Plaintiff does not allege any disclosure of statements outside
of official reporting channels or to anyone outside the Duke
administration; at a minimum, Plaintiff does not dispute this
finding. (Cho Dep. (Doc. 34-1) at 160.) Reporting potential
misconduct through the appropriate private administrative
channels is "privileged" in nature, see Phillips, 117 N.C. App.
at 278, 450 S.E.2d at 756 (finding that an employee's report of
the plaintiff's misconduct to the superintendent was privileged,
when it was done privately), or is at least the proper occasion
to pass these issues along to the administrative processes
likely required to address these issues. Plaintiff submits no
evidence to the contrary. Plaintiff admits that she is not aware
of whether Defendant Hockenberry made defamatory comments to
anyone outside of Duke. (Cho Dep. (Doc. 34-1) at 160.)

Fourth, Defendant Hockenberry made all of these statements
in a "manner and under circumstances fairly warranted by the
occasion and duty, right, or interest." As one of Plaintiff's
supervisors, these comments are entirely appropriate for a
performance review or for a report of "perceived protocol

- 28 -

violations," given the numerous reported complaints regarding Plaintiff's difficulties with staff and following protocols. These complaints included, among others, Plaintiff allegedly granting a PhD student unauthorized access to secure electronic data, re-opening the study at UAB, and attempting to use unauthorized training materials. (Hockenberry Decl. (Doc. 20-3) ¶¶ 12, 14, 17.) In sum, Defendant Hockenberry's statements concerning Plaintiff's personnel issues and Plaintiff's research are shielded by qualified privilege; in order to defeat summary judgment, Plaintiff must provide some evidence that Defendants acted with malice. See Shreve v. Duke Power Co., 97 N.C. App. 648, 651, 389 S.E.2d 444, 446 (1990) ("The existence of a privilege creates a presumption that the statement was made in good faith and without malice."). Defendant Hockenberry has established the elements of qualified privilege; the burden then shifts to Plaintiff to prove actual malice. See Towne v. Cope, 32 N.C. App. 660, 664, 233 S.E.2d 624, 627 (1977).

Plaintiff does not, however, create a genuine issue of material fact with respect to whether Defendant Hockenberry made these statements in good faith. Plaintiff submits only her deposition in support of her allegations. In particular Plaintiff states that "Marilyn Hockenberry said I had very wrong relationship, very difficult relationship with others, and I made some violations on my research . . . Hockenberry was really

concern about my research activity." (Cho Dep. (Doc. 34-1) at 127.) This is not enough, considered in the context of a one-on-one performance review, to rise to the level of bad faith or actual malice. See Phillips, 117 N.C. App. at 278, 450 S.E.2d at 756.

Plaintiff also offers no evidence to demonstrate that Defendant Hockenberry submitted the report, concerning whether Plaintiff showed sensitive data to a PhD student, to the IRB in bad faith. See Shreve, 97 N.C. App. at 651, 389 S.E.2d at 446. Plaintiff only provides her deposition testimony that Adams told her in an email that Adams was "very sorry" and that it was not her who reported Plaintiff to the IRB. (Cho Dep. (Doc. 34-1) at 129.) As noted above, however, the court will not consider inadmissible hearsay on a summary judgment motion. Md. Highways Contractors Ass'n, 933 F.2d at 1251. Plaintiff therefore offers nothing but her own testimony that this report was made in bad faith or with actual malice.

Defendant Hockenberry's statements to Plaintiff during the performance review and about Plaintiff's research to the Office of Audit, Risk and Compliance and the IRB were therefore "limited in . . . scope to [her] purpose," were done on "a proper occasion," and "publi[shed] in a proper manner and to proper parties only." Harris, 102 N.C. App. at 331, 401 S.E.2d at 850. Because Defendant Hockenberry's statements are

privileged, and Plaintiff fails to prove actual malice or a lack of good faith, Plaintiff fails to create a genuine issue of material fact that these statements are defamatory.

### 3. Other Statements Defendant Hockenberry Purportedly Made

Plaintiff offers three other examples of defamatory comments made to colleagues. First, in Plaintiff's words, "Most important first is the first meeting and called everybody and just treat me as a really wrongful researcher, I do this and I did this, that's all first fabrication . . . ." (Cho Dep. (Doc. 34-1) at 137.) In a second example, Plaintiff submits that Defendant Hockenberry said "that [Plaintiff is a] very bad person and very difficult to relate – have a relationship with, and my research all projects are not – what I have done is really concern, and just be careful about June Cho." (Id. at 139.) Third and finally, Plaintiff asserts that "Hockenberry advise Im, just away from June Cho and nothing will help you if you keep that relationship." (Id. at 141.)

Regarding the first statement, Plaintiff submits nothing more than that bare assertion of what Defendant Hockenberry said. Defendant Hockenberry's statement, on its face, does not raise a genuine issue of material fact as to whether it "impeaches the plaintiff in h[er] trade, business, or profession." Boyce & Isley, PLLC, 153 N.C. App. at 29–30, 568

S.E.2d at 898. The only part of that allegation that could be considered defamatory — "wrongful researcher" — describes the manner in which Plaintiff believes she was treated, not what any Defendant said. This statement therefore is not defamatory as a matter of law.

Plaintiff also asserts that Defendant Hockenberry told Plaintiff's colleagues that Plaintiff is a "very bad person and very difficult to relate – have a relationship with." (Cho Dep. (Doc. 34-1) at 139.) Plaintiff fails, however, to provide any other facts to support this assertion. She does not list to whom these statements were made nor any specific occasions when these statements were made. Without more,[11] this assertion does not rise to the level of specific facts sufficient to create a genuine issue of material fact. See Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

As to the third statement, Plaintiff offers as evidence a statement Defendant Hockenberry made to Dr. Im around May 2018, in which she told Dr. Im to stay away from Plaintiff "and

---

[11] Plaintiff fails to present any facts as to what may have been specifically said. The allegations that Plaintiff is a "bad person" and "difficult to . . . have a relationship with," standing alone, are personal opinions, not slanderous statements. See Daniels v. Metro Magazine Holding Co., 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006) ("Rhetorical hyperbole and expressions of opinions not asserting provable facts are protected speech.").

nothing will help you if you keep that relationship." (Cho Dep.
(Doc. 34-1) at 141–42.) Because neither party explicitly
addressed this statement in their original briefs, this court
requested supplemental briefing on whether this statement is
defamatory as a matter of law, and whether this statement would
be admissible in evidence as to comport with Federal Rule of
Civil Procedure 56(c)(2). (Doc. 35.) Both parties filed briefs
in response. (Docs. 36, 37.)

Plaintiff contends that this statement is admissible and
defamatory. Plaintiff cites four exceptions to the Federal Rules
of Evidence's general prohibition on hearsay: (1) that Rule 801
allows "a statement made by an employee on an issue within the
scope of his/her employment"; (2) that it was an excited
utterance under Rule 803; (3) that it was evidence of a then-
existing emotional condition of Defendant Hockenberry under Rule
803; and (4) that it falls within Rule 807's residual exceptions
clause. (Pl.'s Supplemental Brief (Doc. 36) at 4–5.) The court
finds that none of these exceptions apply here.

For a double-hearsay statement to be admitted, there must
be an applicable exception for each level of hearsay. Fed. R.
Evid. 805. The statement at issue here is double hearsay: the
first level is what someone told Plaintiff and the second level
is what Defendant Hockenberry said to Dr. Im. Plaintiff has not
clarified where she heard this statement from, therefore this

court cannot say whether there is an applicable hearsay exception for that recitation of Defendant Hockenberry's statement. Plaintiff only states that "[o]ne may not expect the statement to have been addressed by Dr. Im in the statement presented previously," (id. at 5), but this does not clarify whether Dr. Im was the way Plaintiff heard about Defendant Hockenberry's alleged statement. Nevertheless, Plaintiff has not provided an exception for what the court can only guess is Dr. Im, or another Duke employee, allegedly telling Plaintiff what Defendant Hockenberry said.[12] Because this is inadmissible double hearsay, and Plaintiff has failed to demonstrate how this statement might be admissible at trial, the court may not consider it on Defendants' motion for summary judgment. Plaintiff thus does not create a genuine issue of material fact as to whether this statement is defamatory.

### 4. Defendant Hockenberry Did Not Defame Plaintiff as a Matter of Law

Because Plaintiff's evidence with regard to statements about Plaintiff's alleged violence and other statements made to Plaintiff's colleagues is inadmissible, and the statements made during Plaintiff's annual review and to the IRB and the Office

---

[12] If it was a Duke employee who told Plaintiff what Defendant Hockenberry allegedly said, the party-opponent's employee hearsay exception under Fed. R. Evid. 801(d)(2)(D) would not apply because Plaintiff is not suing Duke for defamation.

of Audit, Risk and Compliance are protected by qualified privilege, Plaintiff fails to create a genuine issue of material fact for these statements.

Plaintiff's claim for an injunction against Defendant Hockenberry is based upon the same facts this court finds insufficient to establish a claim on the merits. The claim for a preliminary injunction will be denied as a matter of law.

**B.    Tortious Interference with Contract**

Plaintiff alleges Defendant Hockenberry interfered with her contract with Duke and raises a claim of tortious interference with contract under North Carolina law. (Compl. (Doc. 7) at 3.) Specifically, she alleges that Defendant Hockenberry reported alleged protocol violations to the IRB and requested an audit, and that this was done intentionally to interfere with Plaintiff's contract. (Id. at 4.)

To prevail on a tortious interference with contract claim under North Carolina law, a plaintiff must show: "(1) the existence of a valid contract between plaintiff and a third party; (2) knowledge by defendant of the contract; (3) acts by defendant to intentionally induce the third party not to perform the contract; (4) defendant's acts were committed without justification; and (5) actual damage to the plaintiff." Barker, 136 N.C. App. at 462, 524 S.E.2d at 826. "A plaintiff may maintain a claim for tortious interference with contract even if

the employment contract is terminable at will." <u>Bloch v. Paul</u>
<u>Revere Life Ins. Co.</u>, 143 N.C. App. 228, 239, 547 S.E.2d 51, 59
(2001). "Bad motive is the essence of a claim for tortious
interference with contract." <u>Id.</u>

Here, elements one and two are satisfied, which Defendants
do not dispute: There was a valid contract between Plaintiff and
Duke, and Defendant Hockenberry knew of this contract. (Defs.'
Br. (Doc. 21) at 3, 22.) With regard to the third element — acts
by defendant to intentionally induce the third party not to
perform the contract — Defendant Hockenberry contests that she
induced Duke not to renew Plaintiff's contract. (Defs.' Reply
(Doc. 27) at 12.)

The question for this court, therefore, is whether an issue
of material fact exists that could cause a reasonable juror to
find that Defendant Hockenberry wrongfully induced Duke to not
renew Plaintiff's contract. "Inducement" is defined as "[t]he
act or process of enticing or persuading another person to take
a certain course of action." *Inducement*, <u>Black's Law Dictionary</u>
(11th ed. 2019). This court finds as follows: (1) that Plaintiff
fails to submit facts which are admissible to establish any
inducement by Defendant Hockenberry; and (2) even if Defendant
Hockenberry induced Duke not to renew Plaintiff's contract, that
inducement was not wrongful because Defendant Hockenberry
established that she is not an outsider to the contract.

While Plaintiff submits evidence that Defendant Hockenberry, by reporting alleged protocol violations to the IRB and requesting an audit, set events in motion that culminated in Duke not renewing Plaintiff's contract, (Hockenberry Decl. (Doc. 20-3) ¶¶ 13, 15, 17; Broome Decl. (Doc. 20-4) ¶ 4), Plaintiff does not submit sufficient evidence that Defendant Hockenberry's acts were intended to "entic[e] or persuad[e]" Duke not to perform the contract. Plaintiff only asserts that Defendant Hockenberry wrote Plaintiff's termination letter, which was signed by Broome. (Cho Dep. (Doc. 34-1) at 107-08.) She contends that "Dr. Im told [Plaintiff] that a physician had told her that Dr. Hockenberry was asked to resign because she had done something without the Dean's permission."[13] (Id. at 108.)

This assertion cannot serve as a basis for finding a genuine issue of material fact because it is predicated on

---

[13] Plaintiff's full statement concerning this incident is as follows:

> I thought that decision made by Marilyn Hockenberry rather than Dean Broome, because first, Dean Broome is traveling, and second, that there is evidence that when Eun-Ok Im had interview with medical doctors before becoming new ADR, the medical doctor told Im, Do you know why Marilyn Hockenberry has to retire, and Im said, I don't know, I don't have any idea. And then medical doctor ask Im, Go to Marilyn Hockenberry and ask her why she has to retire. And Im said, How can I ask? And the medical doctor said, She did something without Dean permission.

(Cho Dep. (Doc. 34-1) at 107-08.)

inadmissible double hearsay, as there are no applicable exceptions for either statement, neither Im's nor the physician's. As noted above, the court will not consider inadmissible hearsay on a summary judgment motion. Md. Highways Contractors Ass'n, 933 F.2d at 1251. Plaintiff's assertion that Defendant Hockenberry essentially took matters into her own hands to fire Plaintiff is based entirely on what Dr. Im told Plaintiff, and what a doctor told Dr. Im. Both levels of this assertion are based on inadmissible hearsay. Plaintiff submits no other evidence tending to prove Defendant Hockenberry forged Plaintiff's termination letter, therefore, the court will not consider this statement in determining whether Defendant Hockenberry induced Duke to end Plaintiff's contract.

Even if the court were to find that Defendant Hockenberry had induced Duke not to renew Plaintiff's contract, Defendant Hockenberry was justified in doing so under the fourth element of tortious interference, concerning whether a defendant was justified in interfering with a contract.

In arguing that Defendant Hockenberry would have been justified in interfering with Plaintiff's contract, Defendants argue that Defendant Hockenberry was a non-outsider to Plaintiff's contract with Duke. With regard to the justification requirement, "[w]hether a defendant is justified in interfering with a plaintiff's contract depends upon 'the circumstances

surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.'" Bloch, 143 N.C. App. at 239-40, 547 S.E.2d at 59 (quoting Robinson, Bradshaw & Hinson, P.A. v. Smith, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850 (1998)). A non-outsider is one who "though not a party to the terminated contract, had a legitimate business interest of [her] own in the subject matter." Smith v. Ford Motor Co., 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). The status of non-outsider "is pertinent only to the question of [the] justification for [defendants'] action." Id. at 88, 221 S.E.2d at 292. The burden is on a defendant to prove that they are a non-outsider and therefore justified in their actions. See Embree Constr. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 499, 411 S.E.2d 916, 925 (1992) (holding that justification is an affirmative defense in tortious interference cases and therefore the burden is on the defendant).

Generally, "'non-outsiders' often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." Lenzer v. Flaherty, 106 N.C. App. 496, 513, 418 S.E.2d 276, 286 (1992). However, "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect

the non-outsider's interests in the contract interfered with." Id., 418 S.E.2d at 286.

"In order to hold a 'non-outsider' liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that '[s]he does a wrongful act or exceeds h[er] legal right or authority in order to prevent the continuation of the contract between the parties.'" Bloch, 143 N.C. App. at 240, 547 S.E.2d at 60 (quoting Robinson, Bradshaw & Hinson, 129 N.C. App. at 318, 498 S.E.2d at 851).

Plaintiff claims that "Hockenberry is an outsider to the subject contract between Plaintiff and Duke," (Pl.'s Resp. (Doc. 26) at 12), but offers no facts to support that claim. The undisputed facts establish that Defendant Hockenberry was an employee of Duke, a party to the contract. The facts are not disputed that Defendant Hockenberry was Plaintiff's supervisor and "had a legitimate business interest of [her] own in the subject matter" of Plaintiff's performance of her duties. See Smith, 289 N.C. at 87, 221 S.E.2d at 292. Indeed, Plaintiff concedes that it was "[a]bsolutely her job, and that's her good reason to give hard time to [Plaintiff]," and that "part of her role was to protect the university." (Cho Dep. (Doc. 34-1 at 183-84.) The court will therefore treat Defendant Hockenberry as a non-outsider to Plaintiff's contract.

Because the court is treating Defendant Hockenberry as a non-outsider to Plaintiff's contract, Plaintiff must establish Defendant Hockenberry acted with "legal malice" — that she did a "wrongful act or exceed[ed] h[er] legal right or authority in order to prevent the continuation of the contract between the parties." Bloch, 143 N.C. App. at 240, 547 S.E.2d at 60 (internal quotation marks omitted). Plaintiff submits no evidence that Defendant Hockenberry committed a "wrongful act" or exceeded her authority in reporting alleged protocol breaches to the relevant authority within the Duke administration. Plaintiff admits that it was "reasonable for [Defendant Hockenberry] to raise concerns about work performance or perceived security issues or perceived protocol deviations," that it was "[a]bsolutely her job, and that's her good reason to give hard time to [Plaintiff]," and that "part of her role was to protect the university." (Cho Dep. (Doc. 34-1 at 183-84.) Plaintiff also admits that it was within the scope of Defendant Hockenberry's role to request an audit. (Id. at 78.) Plaintiff therefore does not raise a genuine issue of material fact as to whether Defendant Hockenberry was justified in reporting potential protocol breaches.

Because there is no evidence that Defendant Hockenberry intentionally or wrongfully induced Duke not to renew Plaintiff's contract, the court need not address whether

Plaintiff sustained actual damages from Duke not renewing her contract. Plaintiff fails to raise a genuine issue of material fact as to whether Defendant Hockenberry tortiously interfered with her contract with Duke, and therefore Defendants' motion for summary judgment as to this claim will be granted.

### C. National Origin Discrimination and Retaliation

Plaintiff fails to submit any direct evidence of discrimination and fails to make out a prima facie case of discrimination. For those reasons, Defendants' motion for summary judgment as to this claim will be granted.

### 1. National Origin Discrimination

Plaintiff has not submitted direct evidence of intentional discrimination, and both parties agree Plaintiff is proceeding upon a circumstantial case of discrimination under Title VII. (See Defs.' Br. (Doc. 21) at 14–15; Pl.'s Br. (Doc. 26) at 6.)

In the absence of any direct evidence of discrimination, the Fourth Circuit applies the McDonnell Douglas framework to employment discrimination cases. Goode v. Cent. Va. Legal Aid Soc'y, Inc., 807 F.3d 619, 626 (4th Cir. 2015). Under the McDonnell Douglas framework, a plaintiff "has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). To establish a prima facie case of discrimination, the plaintiff must demonstrate "(1) membership

in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." Goode, 807 F.3d at 626 (quoting Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)).

After a plaintiff successfully makes out a prima facie case of discrimination, "the defendant may respond by producing evidence that it acted with a legitimate, nondiscriminatory reason," at which point the "plaintiff may adduce evidence showing that the defendant's proffered reason was mere pretext and that [national origin] was the real reason for the defendant's less favorable treatment of the plaintiff." Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). While the burden shifts back and forth between the plaintiff and defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff." Tex. Dep't of Cmty. Affairs, 450 U.S. at 253.

Plaintiff satisfies the first prong, as Plaintiff is a member of a protected class as a Korean-born person. (Cho Dep. (Doc. 34-1) at 10.) Even assuming Plaintiff has established she satisfactorily performed her job and was terminated, Plaintiff has failed to present any evidence that other similarly situated individuals were treated differently. Plaintiff does not address

the similarly situated requirement in her response outside of
her recitation of the prima facie requirements, (Pl.'s Resp.
(Doc. 26) at 6–7); Plaintiff submits no evidence, admissible or
not, of similarly situated comparators in her deposition or in
any of the other evidence she submits, including her EEOC
Charge, a Duke interrogatory, and a deposition of her husband.
There is no genuine issue of material fact if the nonmoving
party fails to make a sufficient showing of an essential element
of its case as to which it would have the burden of proof at
trial. See Celotex, 477 U.S. at 322–23.

In the absence of any evidence that individuals outside the
protected class were treated differently in their employment,
the facts submitted do not present an issue of fact that
Plaintiff's termination was based upon improper discrimination.
Because Plaintiff has failed to make a sufficient showing on an
essential element of the prima facie case, Plaintiff fails to
raise a genuine dispute as to any material fact with regard to
whether Defendants discriminated against her. Plaintiff's claim
for national origin discrimination must fail.

## 2.   Retaliation

Title VII prohibits an employer from "retaliating against
an employee for complaining about prior discrimination." Foster
v. Univ. of Md.–E. Shore, 787 F.3d 243, 249 (4th Cir. 2015). To
establish a prima facie case of retaliation, "a plaintiff must

prove (1) that she engaged in a protected activity, as well as (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (internal quotation marks omitted). Filing an EEOC charge is a protected activity. 42 U.S.C. § 2000e-3(a). Title VII retaliation claims require a showing that the action would not have happened but for the plaintiff's protected activity. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).

Retaliatory actions "need not 'affect the terms and conditions of employment'" but must be "'materially adverse'[ ]such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 68 (2006)). Once an employee makes out a prima facie case, the employer bears the burden of producing a legitimate nonretaliatory reason for the materially adverse action. See id. at 328. The employee then bears the burden of showing, by a preponderance of the evidence, that the employer's stated rationale is a pretext for retaliation. Id.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with

respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also prohibits retaliation by a private employer against an employee because the employee has (1) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII or (2) "opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). These are referred to as the participation clause and the opposition clause, respectively. Under the opposition clause, "an employee is protected when she opposes not only . . . employment actions actually unlawful under Title VII but also employment actions she reasonably believes to be unlawful." Boyer-Liberto, 786 F.3d at 282 (alterations and internal quotation marks omitted); Strothers, 895 F.3d at 327. This opposition activity, however, is only protected if an employee's subjective belief is also "objectively reasonable in light of the facts." Peters v. Jenney, 327 F.3d 307, 321 (4th Cir. 2003); see also Strothers, 895 F.3d at 327.

Plaintiff alleges that Duke retaliated against her for filing her grievance report. (Compl. (Doc. 7) at 4-5.) Plaintiff's grievance report, however, was focused on Defendant Hockenberry's managerial style: that Defendant Hockenberry

tended to micromanage, that she needed to be copied on emails, and that she tended to only point out Plaintiff's failures and did not compliment Plaintiff when she succeeded. (Cho Dep. (Doc. 34-1) at 89.) Title VII only provides protection against discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see also Burlington N. & Santa Fe Ry., 548 U.S. at 68 (citing, with approval, a treatise that notes that "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable" (internal quotation marks omitted)). As such, Plaintiff could not have had a reasonable belief that the conduct she was opposing violated Title VII, because she was not even complaining of discrimination: Plaintiff was complaining about Defendant Hockenberry's management style. This grievance therefore does not constitute protected activity.

Plaintiff submits no other evidence or argument that Defendants retaliated against her for any other activity. Plaintiff thus fails to meet the first element of the prima facie case of retaliation, that she was engaged in protected activity. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient showing on an essential element of its case as to which it would have the burden of proof at trial. See Celotex, 477 U.S. at 322–23. Because Plaintiff cannot make out a prima facie case of

retaliation, Plaintiff fails to raise a genuine issue of material fact as to whether Defendants retaliated against her for her national origin discrimination claims. The court will grant Defendant' motion for summary judgment on this claim.

### D. **North Carolina Public Policy and Statutory Claims**

Plaintiff also claims that Defendant Duke's conduct violated the public policy of the State of North Carolina and N.C. Gen. Stat. § 143-422.1 et seq. (Compl. (Doc. 7) ¶ 40.)

North Carolina Equal Employment Practices Act ("NCEEPA"), the North Carolina state law on which Plaintiff bases this claim, states:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. § 143-422.2(a). North Carolina courts, when interpreting NCEEPA, "look to federal decisions for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." Abels v. Renfro Corp., 335 N.C. 209, 218, 436 S.E.2d 822, 827 (1993) (quoting Dep't of Corr. v. Gibson, 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983)); see also Donovan v. Bragg Mut. Fed. Credit Union, No. 5:18-CV-148-FL, 2019 WL 189000, at *5 (E.D.N.C. Jan. 14, 2019) (applying Title VII doctrine to a claim brought under NCEEPA). NCEEPA thus

creates a private state law cause of action for "wrongful discharge." <u>Smith v. First Union Nat'l Bank</u>, 202 F.3d 234, 247 (4th Cir. 2000).

This court, in discussing Plaintiff's claim of national origin discrimination under Title VII above, has addressed Plaintiff's NCEEPA wrongful discharge claim. Because the court must apply the same facts and legal standard to Plaintiff's NCEEPA claim as were applied to her Title VII claim, <u>see</u> <u>Abels</u>, 335 N.C. at 218, 436 S.E.2d at 827, Defendants' motion for summary judgment as to Plaintiff's North Carolina claims must be granted.

**IV.  CONCLUSION**

Because Plaintiff fails to raise a genuine dispute as to any material fact for any of her four claims, summary judgment is therefore appropriate.

For the foregoing reasons, this court finds that Defendants' motion for summary judgment should be granted.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 20), is **GRANTED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE.**

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 21st day of January, 2020.

_____
United States District Judge